**Bernard L. SILVER, Cartwright–Mitchell, Inc., a Delaware corporation, Plaintiffs–Appellants,**

**v.**

**UNITED STATES POSTAL SERVICE, Defendant–Appellee.**

**No. 89–16447.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 13, 1991.

Decided Dec. 11, 1991.

Dale B. Hinson, Washington, D.C. and W. Leslie Sully, Jr., Sully, Lenhardt & Raizin, Las Vegas, Nev., for plaintiffs-appellants.

Irene M. Solet, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before GOODWIN, THOMPSON and O'SCANNLAIN, Circuit Judges.

PER CURIAM:

This appeal squarely raises the constitutionality of the statute creating the Board of Governors of the United States Postal Service.

## I

In September 1986, the Postal Service's General Counsel filed a complaint against Bernard L. Silver alleging that Silver was engaged in a scheme to obtain money or property through the mails by means of false representations, in violation of 39 U.S.C. § 3005. The General Counsel alleged that Silver, operating through his business Cartwright–Mitchell, Inc., made representations in advertisements that his product, Mammrae–9000, would cause a female user's breasts to grow larger, and that such representations were materially false.

A hearing was held before an Administrative Law Judge ("ALJ"). The Postal Service presented testimony from an expert in medicine and an expert in consumer psychology and marketing. Silver presented the testimony of his business manager, the president of the firm that manufactures Mammrae–9000, and an expert in ad-

vertising and consumer behavior. The ALJ entered an Initial Decision in favor of the Postal Service.

Silver appealed to the Postal Service Judicial Officer. The Judicial Officer found that the ALJ's ruling was supported by a preponderance of the evidence and made no errors of law. The Postal Service issued a cease and desist order barring Silver from continuing his representations about breast enlargement, and issued orders that Silver's mail relating to Mammrae–9000 be returned to sender and that Postal Money Orders drawn to Silver's order not be paid.

In July 1988, Silver and Cartwright–Mitchell, Inc. ("Silver") filed suit in the United States District Court for the District of Nevada against the Postal Service.[1] Silver sought injunctive relief to prevent the enforcement of the cease and desist and other orders, alleging them to be arbitrary and capricious and not supported by substantial evidence, that Silver had been denied due process, that his free speech rights had been unconstitutionally infringed, and that separation of powers principles were violated in the creation of the Postal Service. The parties made cross motions for summary judgment and the district court granted the Postal Service's motion and denied Silver's. The district court entered a final order and Silver timely filed notice of appeal.

## II

Silver argues that the Postal Service lacks enforcement powers under the Constitution because it is not part of the executive branch, and because the Postal Service Board of Governors (the "Board") has members whose appointment procedures violate the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. We address these arguments in turn.

## A

■ Under our three-branch scheme of government, the President (as head of the executive branch) is assigned exclusive responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Silver contends that the Postal Service is not part of the executive branch of the federal government and hence lacks the authority to enforce federal law.

To support his argument, Silver points to sections of Title 5 of the United States Code, which concerns government organization. Silver notes that the Postal Service is not included in the list of executive departments or government corporations. *See* 5 U.S.C. §§ 101, 103.

The mere fact that the Postal Service is not designated a department or government corporation, however, does not mean it is not a part of the executive branch. When Congress created the Postal Service, it made the Postal Service "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. Under the Postal Reorganization Act of 1970 ("PRA"), Congress changed the management structure of the Post Office for the purported purpose of making its operations more "businesslike." H.R.Rep. No. 1104, 91st Cong., 2d Sess. 13, *reprinted in* 1970 U.S.Code Cong. & Admin.News 3649, 3660. Nonetheless, Congress could not have made its intent more clear that the Postal Service was to remain a part of the U.S. Government and to perform executive branch functions within that government. In addition to the clear language of section 201, the first sentence of the PRA as codified states: "The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States...." 39 U.S.C. § 101(a).

Silver cites language from section 104 of Title 5 to support his claim that the Postal Service is not part of the executive branch. The very language he quotes, however, seems to make the opposite point. Section 104 reads: "For the purpose of [Title 5— Government Organization and Employees], 'independent establishment' means—(1) an establishment in the executive branch (other than the United States Postal Service or

---

**1.** "United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a).

the Postal Rate Commission)...." 5 U.S.C. § 104. It is only because the Postal Service *is* "an establishment of the executive branch" as that term is generally understood that the drafters of section 104 found it necessary to make an exception for the Postal Service for certain definitional purposes under Title 5.

That the Postal Service is not an organization independent of the United States government is also indicated by several other facts. Employees of the Postal Service are part of the Civil Service system. 39 U.S.C. § 1001(b). The standards of suitability, security, and conduct of chapter 73 of Title 5 that apply to all federal employees apply likewise to Postal Service employees. 39 U.S.C. § 410(b)(1). Federal criminal laws that pertain to federal employees also apply to Postal Service employees. 39 U.S.C. § 410(b)(2). The Postal Service has the authority to borrow money backed by the full faith and credit of the United States government. 39 U.S.C. § 2006(c). The Postal Service must annually submit a budget to the Office of Management and Budget. 39 U.S.C. § 2009. Enforcement actions of the Postal Service are not self-enforcing and the Postal Service is dependent upon the Justice Department to bring action in court to obtain civil penalties against violators. 39 U.S.C. § 409(d).

No court has ever held the Postal Service not to be a part of the executive branch. One court has expressly held that the Postal Service is part of the executive branch. *See Friedlander v. U.S. Postal Service,* 658 F.Supp. 95 (D.D.C.1987). Moreover, as the *Friedlander* court noted, "[o]ther courts have assumed without question that the Postal Service is a governmental entity within the executive branch." *Id.* at 101 (citations omitted). We have no doubt that the Postal Service is a part of the executive branch of the United States government.

**B**

■ Silver further contends that even if the Postal Service is structurally a part of the executive branch, the President's executive powers have not been properly delegated to the Postal Service in accordance with the Appointments Clause.[2]

Article II § 2 cl. 2 of the Constitution states:

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other Public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The proper method of appointment hinges upon the nature of the position in question. The Appointments Clause "divides all its officers into two classes." *United States v. Germaine,* 99 U.S. 508, 509, 25

---

**2.** Under the de facto officer doctrine, the invalidity of the appointment of a government official may be challenged only by direct and not collateral attack. Only two circuits have adopted this common law doctrine as law. *See Franklin Sav. Ass'n v. Director, Office of Thrift Supervision,* 934 F.2d 1127, 1150 (10th Cir.1991) and *EEOC v. Sears, Roebuck and Co.,* 650 F.2d 14 (2d Cir.1981). In the face of circuit precedent, the District of Columbia Circuit has reluctantly adopted a narrow interpretation of the doctrine that allows collateral attacks in some circumstances. *See Andrade v. Lauer,* 729 F.2d 1475 (D.C.Cir.1984). The continued vitality of the de facto officer doctrine is in serious doubt, however; in both *Freytag v. Commissioner,* — U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), and *Morrison v. Olson,* 487 U.S. 654, 108

S.Ct. 2597, 101 L.Ed.2d 569 (1988), the Supreme Court entertained collateral challenges based on the Appointments Clause without ever mentioning in either case the de facto officer doctrine.

In its decidedly unenthusiastic adoption of the de facto officer doctrine, the *Andrade* court noted that "the doctrine gives no weight to the public interest in enforcing legal norms concerning eligibility and appointment to office" and concluded that "[a]pplying the de facto officer doctrine would likely leave plaintiffs seeking to challenge the regularity (and, even more important, the constitutionality) of the appointment of government officers without any remedy at all." *Andrade,* 729 F.2d at 1497. With these considerations in mind, we decline to apply the de facto officer doctrine in this case.

L.Ed. 482 (1878). "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley v. Valeo*, 424 U.S. 1, 132, 96 S.Ct. 612, 688, 46 L.Ed.2d 659 (1976). These requirements apply to "any appointee exercising significant authority pursuant to the laws of the United States." *Id.* at 126, 96 S.Ct. at 685. Individuals who are merely employees of the United States government do not implicate the Appointments Clause. *Id.* at 126 n. 162, 96 S.Ct. at 685 n. 162.

While Congress may not delegate itself a role in the appointment process, *Buckley*, 424 U.S. at 127, 96 S.Ct. at 686, and Congress may not retain control over officers delegated executive functions, *Bowsher v. Synar*, 478 U.S. 714, 734, 106 S.Ct. 3181, 3191, 92 L.Ed.2d 583 (1986), the Constitution affords Congress substantial discretion to fashion appointments within the specified constraints. "But as the Constitution stands, the selection of the appointment power, as between the functionaries named, is a matter resting in the discretion of Congress." *Ex Parte Siebold*, 100 U.S. 371, 397–98, 25 L.Ed. 717 (1880). The Supreme Court recognized this fact in upholding the appointment process of the special prosecutor in the Ethics in Government Act, 28 U.S.C. §§ 49, 591–99. "Indeed, the inclusion of 'as they think proper' seems clearly to give Congress significant discretion to determine whether it is 'proper' to vest the appointment of, for example, executive officials in the 'courts of Law.'" *Morrison v. Olson*, 487 U.S. 654, 673, 108 S.Ct. 2597, 2609, 101 L.Ed.2d 569 (1988).

Assessing the constitutionality of the Postal Service requires a clear understanding of the organization's structure and operation. As evident from the analysis in Part IIA of the opinion, the Postal Service is unique within the federal government. The PRA explicitly rejected the rigid hierarchical structure of traditional executive departments. Instead, Congress chose to organize the Postal Service along the lines of a corporation, creating a division between those who control the organization and those who are responsible for "running the business." This went beyond simple rule by committee and implemented a functional division of labor that split the function of governance from the function of management.

It would be a mistake to infer constitutional infirmity from the fact that the Postal Service's organization is novel or different. The fact that the Postal Service is not structured like a traditional government agency need not imply that its structure is not constitutionally permissible. There is no one way to structure an agency nor one means to comply with the constitutional appointment process. At the same time, the court is aware of its obligations to guard the "structural interests protected by the Appointments Clause." *Freytag v. Commissioner*, —— U.S. ——, 111 S.Ct. 2631, 2639, 115 L.Ed.2d 764 (1991). While Congress is afforded significant discretion to fashion appointments within the constraints of the Constitution, the boundaries outlined in the Appointments Clause cannot be transgressed. The PRA must conform with the Constitution.

Nine individuals are appointed by the President and confirmed by the Senate to serve as governors of the Postal Service. 39 U.S.C. § 202(a). The governors are appointed to staggered nine year terms and no more than five governors may adhere to the same political party. Governors may be removed only for cause. Collectively, the nine individual governors constitute a body known as the GOVERNORS. The GOVERNORS are assigned a number of responsibilities within the Postal Service that only they can perform.

One of the primary responsibilities of the GOVERNORS is the appointment of the Postmaster General ("PG"). 39 U.S.C. § 202(c). Consistent with the corporate model of organization, the PG is designated the "chief executive officer of the Postal Service." 39 U.S.C. § 203. The PG may be removed at will by the GOVERNORS who are also responsible for fixing his salary and the length of his term. 39 U.S.C. § 202(c). Removal of the PG requires an

absolute majority of five votes. 39 U.S.C. § 205(c)(1).

The GOVERNORS and the PG jointly appoint and have the joint power to remove the Deputy Postmaster General ("DPG"). 39 U.S.C. § 202(d).

Together, the nine individual governors, the PG and the DPG form an eleven member Board of Governors ("Board"). Except for the powers exclusively reserved to the GOVERNORS, the Board is authorized to "exercise the power of the Postal Service." 39 U.S.C. § 202(a). This includes the authority to "direct and control the expenditures and review the practices and policies of the Postal Service." 39 U.S.C. § 205(a). The Board may delegate its authority to the PG and to special committees that it is empowered to create. Any authority that is delegated, however, "shall be revokable by the [GOVERNORS] in their exclusive judgement." 39 U.S.C. § 402.

Because we find that the Postal Service is a "department" capable of receiving appointment authority; that, within the corporate structure adopted by Congress, the GOVERNORS are the head of the department; and that, as management agents, the PG and the DPG are "inferior" officers, we hold that the PRA conforms with the requirements of the Appointments Clause and is therefore constitutional.

In *Buckley*, the Supreme Court indicated that "departments," the heads of which are capable of appointing inferior officers, must be "in the Executive Branch or at least have some connection with that branch." 424 U.S. at 127, 96 S.Ct. at 686. In Part IIA of the opinion we held that the Postal Service is part of the Executive Branch. *Freytag* indicates that this finding alone is insufficient. The Court rejected the proposition that "every part of the Executive Branch is a department the head of which is eligible to receive the appointment power." 111 S.Ct. at 2642. While the Court never defined exactly what constitutes a "department" for Appointments Clause purposes, it suggested that departments are "executive divisions *like* the Cabinet-level departments." *Id.* at 2643 (emphasis added). In limiting the defini-

tion of "departments," the Court indicated a concern over "preventing the diffusion of the appointment power." *Id.* at 2638.

We hold that the Postal Service is a "department" that is capable of receiving the ability to appoint inferior officers under Article II § 2 cl. 2. Up until its reorganization in 1970, the Post Office Department was in fact a Cabinet-level department. The PRA reorganized the Post Office Department into the present United States Postal Service. The PG was no longer a member of the Cabinet and, consequently, the Postal Service was no longer a Cabinet-level department. The PRA did not, however, fundamentally change the nature and purpose of the Postal Service. The reorganization under the PRA did not render what was once a Cabinet-level department into an entity that was not *"like* a Cabinet-level department." As a result, the head of the Postal Service is capable of appointing inferior officers, if so directed by Congress.

■ This raises the important question: Who or what constitutes the head of the Postal Service? There are three apparent options: the GOVERNORS, the PG, and the Board. No assessment can be made absent a contextual appreciation of the organizational structure adopted by Congress. Within the corporate framework explicitly established by Congress, the GOVERNORS are the head of the department. Congress carefully vested ultimate control and authority of the Postal Service in the GOVERNORS. The GOVERNORS hold three key trump cards: (i) the power to appoint and remove the PG, 39 U.S.C. § 202(c), (ii) the unilateral power to revoke any authority delegated by the Board, 39 U.S.C. § 402, and (iii) the authority to designate mail classifications and to set postal rates, 39 U.S.C. § 3621. To be sure, the PG and the DPG, as management agents, are extended significant responsibility to "run the business," and the Board exercises an important supervisory role, but the reins of power reside exclusively with the GOVERNORS.

In light of the GOVERNORS removal authority, it is impossible to conclude that

the PG is the head of the department. The significance of appointment and removal power is well established in Appointments Clause jurisprudence. The GOVERNORS have the authority to appoint the PG, to fix the PG's salary and length of term, and to remove the PG from office. *There are no statutory restrictions on the removal power.* The removal decision is within the complete discretion of the GOVERNORS and is not subject to judicial review. *See Carlin v. McKean*, 823 F.2d 620, (D.C.Cir. 1987), *cert. denied*, 484 U.S. 1046, 108 S.Ct. 784, 98 L.Ed.2d 870 (1988).

> The statutory language here is quite explicit. The Governors are granted full power to appoint and to remove the Postmaster General. 39 U.S.C. § 202(c) (1982). No qualifications whatever are attached to their exercise of these powers.... This language unmistakably vests the Governors with complete authority over the Postmaster's tenure and is ample indication that Congress intended to preclude judicial review of their decisions to appoint or remove any person in that post.

*Id.* at 623.

The power to remove is the power to control. The truth of this statement was recognized by the Supreme Court in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). "For it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 629, 55 S.Ct. at 874. In *Bowsher* the Court maintained that the removal power need not be exercised to exert effective control, the mere existence of removal authority is likely to influence behavior. 478 U.S. at 727 n. 5, 106 S.Ct. at 3188 n. 5. "In Constitutional terms, the removal powers over the Comptroller General's office dictate that he will be subservient to Congress." *Id.* at 730, 106 S.Ct. at 3190.

In *Bowsher,* removal required a joint resolution by both Houses of Congress, based on cause. This resolution was subject to presidential veto and arguably subject to judicial review. Still, the Court held that the Comptroller General could not be independent under such circumstances. Removal of the PG, in contrast, need not be based on cause and requires only the vote of five of the nine governors. The decision is not subject to judicial review, *and* the power has been exercised in the past. *See Carlin, supra.*

The significance of the GOVERNORS' removal power goes further. Not only does it demonstrate that the PG is not the head of the department, it demonstrates that, structurally, the PG's position and actions are not independent. This lack of independence goes both to his actions as the chief executive officer, and as a voting member of the Board.

We reject the argument that the Board and not the GOVERNORS constitute the head of the department for Appointments Clause purposes. The Board plays a significant role in running the Postal Service and may "exercise the power of the Postal Service." 39 U.S.C. § 202(a). While the Board's role is significant, it is limited in many important respects. The Board plays no role in designating mail classifications or in setting postal rates. Substantively, these are amongst the most important decisions made by the Postal Service. The Board plays no role in the appointment and removal of the top management positions: the PG and the DPG. Moreover, the GOVERNORS hold a trump with respect to the actions taken by the Board. *The GOVERNORS may unilaterally revoke any authority delegated by the Board.* Again, there are no limitations placed upon the exercise of the GOVERNORS' discretion. The revocation authority may be invoked by the GOVERNORS "in their exclusive judgement." 30 U.S.C. § 402.

█ In light of the holding that the GOVERNORS are the head of the department, we shall now assess the constitutional validity of the appointments of the individual governors, the PG, and the DPG. The individual governors present an easy case. The appointment process of the governors conforms with the process required of principal officers; they are presidential-

ly appointed and confirmed by the Senate. 39 U.S.C. § 202(a). This procedure is consistent with the GOVERNORS' status as the head of the department. It guarantees that those vested with ultimate control of the Postal Service are directly accountable to the President. The appointment of the governors is constitutional.

■ The validity of the PG's appointment turns on whether he is a principal or an inferior officer. "The line between 'inferior' and 'principal' officers is one that is far from clear." *Morrison* 487 U.S. at 671, 108 S.Ct. at 2608. *Morrison* relies on categories identified in *Germaine*'s analysis of the difference between inferior officers and mere employees. The Court considered "ideas of tenure, duration ... and duties." 99 U.S. at 511. *Morrison* addressed the difference between principal and inferior officers in assessing the constitutional status of the special prosecutor. The Court lists a number of factors to be considered. These factors are relevant to the investigation but they are not exhaustive characteristics. The nature of each government position must be assessed on its own merits.

In concluding that a special prosecutor was an inferior officer, the Court in *Morrison* first noted that the prosecutor "is subject to removal by a higher Executive Branch official." 487 U.S. at 671, 108 S.Ct. at 2608. This was persuasive evidence of inferior status even though removal was limited to cause and the prosecutor retained "a degree of independent discretion." *Id.* As already noted, the status, tenure and independence of the PG is significantly more tenuous. The PG is essentially an "at will" employee of the GOVERNORS and is "subordinate" to the GOVERNORS in the sense identified in Justice Scalia's dissent in *Morrison,* 487 U.S. at 720, 108 S.Ct. at 2634. (Scalia, J., dissenting). This argues strongly for the PG's "inferior" status.

*Morrison* emphasized the limited duties, jurisdiction, and tenure of the special prosecutor. While these factors are central to

the office of the special prosecutor, their direct analog to the PG and the Postal Service is less clear. The PG, as chief executive officer, is assigned significant management responsibilities for running the day-to-day business of the Postal Service. Just as his position is different from that of the special prosecutor, his position is significantly different from that of the Secretary of a department such as the Department of State. Inherent in the corporate model is a split between those who control the organization and those who run the business. The PG performs many tasks and has many responsibilities, but he does not have "control." The corporate structure "limits" the PG. He is a management agent, tenuously serving at the pleasure of the GOVERNORS. As a management agent, the PG must be considered an "inferior" officer.[3]

■ Given the PG's "inferior" status, he may be appointed by the GOVERNORS, who act as the head of the department. The appointment process outlined in section 202(c) is constitutional.

The final remaining issue concerns the appointment of the DPG. The same arguments that lead to the conclusion that the PG is an "inferior" officer lead to the conclusion that the DPG is an inferior officer who may be appointed by the head of the department. Silver argues that the fact that the PG has a vote in the appointment of the DPG renders the DPG's appointment unconstitutional. Stated differently: "Does the involvement of the PG imply that the DPG is appointed by something other than the head of the department?" The issue turns on whether or not the involvement of the PG introduces an independent actor into the process.

The PG is the management alter ego of the GOVERNORS. In a real sense, management embodies the collective will of those at whose pleasure they serve. While the PG has a separate vote, the structure of the organization and the nature of his position place clear boundaries on how this

---

**3.** To conclude that the PG is a principal agent would, in effect, prohibit Congress from ever adopting a corporate model of organization. Given the strict control that the GOVERNORS have over the PG, we do not believe that the Appointments Clause dictates that result.

vote can be cast. The vote of the PG must correspond with the collective will of the GOVERNORS. If the correspondence between the actions of the PG and the collective will of the GOVERNORS ceases to exist, so will the PG's tenure in office.

Given the structural relationship between the GOVERNORS, as head of department on the one hand, and the PG, as a management officer on the other, the PG's role in selecting the DPG does not invalidate the DPG's appointment for Appointments Clause purposes. The GOVERNORS do not suddenly become less than the head of the department because they are joined by a management agent who is directly accountable to them.

The appointment process of the United States Postal Service is constitutional.

## III

Silver urges that the Postal Service enforcement action against him was unlawful under several other theories, which we address in turn.

## A

■ Silver contends that due process is offended by the Postal Service exercising both prosecutorial and adjudicative powers in this enforcement action. The mere presence in the same agency of both prosecutorial and adjudicative functions, however, is not in itself unconstitutional. *See Withrow v. Larkin,* 421 U.S. 35, 51–52, 95 S.Ct. 1456, 1466–67, 43 L.Ed.2d 712 (1975). Indeed, the Supreme Court has stated that the same *individuals* may serve both as investigators and adjudicators, and that a party challenging such an arrangement

> must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the

guarantee of due process is to be adequately implemented.

*Id.* at 47, 95 S.Ct. at 1464.

Here, different individuals within the Postal Service served in prosecutorial and investigative roles, but Silver alleges unconstitutionality by reference to the organizational structure of the Postal Service. The General Counsel, who serves a prosecutorial function in enforcement actions, reports to the Postmaster General. *See* 39 C.F.R. § 224.4. The Judicial Officer and ALJs, who adjudicate enforcement actions, report to an Associate Postmaster General. *See* 39 C.F.R. § 226.2(d). Both the General Counsel and the Judicial Officer serve at the pleasure of the Postmaster General. *See* 39 C.F.R. § 221.8. The mere fact that both prosecutorial and adjudicative employees of the Postal Service serve at the pleasure of the same person is not inconsistent with due process.

## B

■ Silver also alleges violations of substantive due process, but these contentions are in fact allegations of another claimed procedural defect. Silver finds a constitutional flaw in the fact that return to sender and cease and desist orders issued against him "without any prior involvement of the Judicial Branch." Silver can cite no authority to support the proposition that the Due Process Clause requires that an Article III court must ratify all agency enforcement actions before they take effect. Rather, " '[d]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)).

Silver was afforded a full evidentiary hearing, at which he presented live testimony of witnesses. Following that he was allowed to appeal the adverse determination of the ALJ to the Judicial Officer. Only after both of these proceedings were final did the Postal Service enter the orders against him. Weighing the factors set forth in *Mathews v. Eldridge,* we cannot

conclude that such procedures violated due process.

## C

Silver contends that the Postal Service's exercise of enforcement powers against fraudulent mailings under section 3005 of Title 39 of the United States Code runs afoul of the Free Speech guarantee of the First Amendment. He urges that *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), which held that the Postal Service could not use administrative proceedings to censor obscene mailings, *id.* at 417, 91 S.Ct. at 428, must be extended to prohibit the use of administrative proceedings to halt fraudulent mailings under section 3005. We have already addressed this argument and rejected it. *See Hollywood House Int'l, Inc. v. Klassen*, 508 F.2d 1276, 1277 (9th Cir.1974).

## D

Finally, Silver contends that the district court and the Judicial Officer erred in concluding that the determinations of the ALJ in this enforcement action were supported by substantial evidence. To affirm the determinations of the ALJ there must be " 'more than a mere scintilla' " of supporting evidence. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). The record must contain "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

To establish a violation of section 3005, representations must be made, and such representations must be materially false. *Peak Laboratories, Inc. v. United States Postal Service*, 556 F.2d 1387, 1389 (5th Cir.1977). The ALJ found that Silver's advertisement for his Mammrae–9000 product made the representation that use of Mammrae–9000 would "cause the female user's breasts to grow larger." The ALJ further found that such a representation was materially false.

Silver concedes that his Mammrae–9000 formula does not cause any permanent enlargement of breast size, and thus he does not take issue with the ALJ's determination that a representation of permanent breast enlargement, if made, would be false. Rather, Silver argues that his advertisements represent Mammrae–9000 as nothing more than a cosmetic that does nothing in any permanent or substantial way to increase breast size, and hence, he alleges that the ALJ erred in his determination of what representations were made in the advertisement.

Substantial evidence supports the ALJ's determination that the Mammrae–9000 advertisement made the representation that use of Mammrae–9000 would cause female user's breasts to grow larger. The advertisement features a picture of a woman with large breasts, and is topped by the headlines "Larger Breasts Guaranteed!" and "Increase Your Actual Cup Size." Customer testimonials state "Mammrae–9000 has definitely enlarged my breasts" and "I slowly but persistently gained 2 inches going from a 32AA to a 32B." The advertisement repeatedly refers to the supposed benefits of larger breasts.

The ALJ relied not just on the advertisement itself to support his determination, but on expert testimony. Dr. Scipione, an expert in consumer psychology, testified that the average reader of the advertisement would believe that the product increased the size of a woman's breasts. The ALJ found that "Dr. Scipione was better qualified than [Silver's expert]; and, his testimony was forthright, credible and far more persuasive than that of [Silver's expert]." We give "great deference to credibility determinations made by administrative law judges." *Sierra Club v. United States Nuclear Reg. Comm'n*, 862 F.2d 222, 230 (9th Cir.1988).

Our review of the record confirms that evidence existed such that a reasonable mind could conclude that Silver's advertisement made the representation that use of Mammrae–9000 would cause breasts to grow larger. We reject the contention that

the ALJ's determination was unsupported by substantial evidence.

## IV

For the aforementioned reasons, the judgment of the district court is

AFFIRMED.

O'SCANNLAIN, Circuit Judge, dissenting:

In my view, the Postmaster General and Deputy Postmaster General are not appointed in a manner consistent with the Appointments Clause, art. 2, § 2, cl. 2. Thus, I respectfully dissent from part IIB of the opinion of the court.

## I

The Appointments Clause describes two processes for appointments of officers of the United States, and those appointed by the respective processes have come to be known as "principal" or "inferior" officers. Principal,[1] i.e., non-"inferior," officers must be appointed by the President with the advice and consent of the Senate. For inferior officers, "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

In our scheme of separation of powers the duty to enforce the laws of the United States falls upon the President. The President may delegate his enforcement duties to members of the executive branch, but the Appointments Clause serves as a check on such delegation. *See Myers v. United States,* 272 U.S. 52, 117–18, 47 S.Ct. 21, 25–26, 71 L.Ed. 160 (1926). Executive branch enforcement powers may only be exercised by officers of the United States appointed in accordance with the Appointments Clause. *Buckley v. Valeo,* 424 U.S. 1, 140, 96 S.Ct. 612, 691, 46 L.Ed.2d 659 (1976) (per curiam).

Silver argues that the Postal Service Board of Governors (the "Board") was not appointed in accordance with the Appointments Clause, and hence may not lawfully exercise executive branch enforcement powers. The eleven-person Board consists of nine Governors, the Postmaster General, and the Deputy Postmaster General. 39 U.S.C. § 202. The constitutionality of the appointment process set forth in section 202 for each of these Board members shall be examined in turn.

## A

Each Governor is appointed to a nine year term by the President, with the advice and consent of the Senate. 39 U.S.C. § 202(a), (b). This clearly comports with the constitutional requirements for the appointment of principal officers. *Buckley,* 424 U.S. at 126, 96 S.Ct. at 685.

## B

The Postmaster General (the "PG") is appointed by the nine Governors. 39 U.S.C. § 202(c). Since the PG is not appointed by the President with the advice and consent of the Senate, his appointment manifestly violates the Appointments Clause if he is a principal officer. For purposes of this analysis, however, it can be assumed that the PG is merely an inferior officer.[2] The Appointments Clause permits inferior officers to be appointed by "Heads of Departments." Hence the constitutionality of the PG's appointment turns on whether the Governors alone, as opposed to the full Board, can be considered a Head of Department.

Silver contends that the term Heads of Departments as used in the Appointments Clause can only apply to those who head executive departments, that is, to members of the Cabinet. The Supreme Court recently declined to address the question of

---

1. The term "principal officer" is found nowhere in the text of the Constitution, but has been adopted by the Supreme Court in its Appointments Clause jurisprudence. *See, e.g., Freytag v. Commissioner,* — U.S. —, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).

2. As the chief executive officer of the Postal Service (39 C.F.R. § 225.1), it can hardly be doubted that the PG is at least an "inferior" officer of the United States.

whether "the head of one of the principal agencies" was a "Head of Department" for purposes of the Appointments Clause. *See Freytag v. Commissioner,* — U.S. —, 111 S.Ct. 2631, 2643 n. 4, 115 L.Ed.2d 764 (1991). Justice Scalia, concurring in part and joined by three other Justices, forcefully argued, however, that "there is no reason, in text, judicial decision, history or policy, to limit the phrase 'the Heads of Departments' in the Appointments Clause to those officials who are members of the President's Cabinet." *Id.* 111 S.Ct. at 2660 (Scalia, J., concurring in part and concurring in the judgment). Justice Scalia pointed out that the Cabinet did not even exist in the original Constitution, *id.* at 2658–59, and that the definition of "department" in an American dictionary roughly contemporaneous with the drafting of the Constitution was stated in terms of having a separate function, and was not dependent on size or status, *id.* at 2660.

Thus the mere fact that the Governors do not sit in the President's Cabinet would not prevent them from collectively [3] constituting a Head of Department. But a closer examination shows that the Governors by themselves, as distinct from the full Board, simply do not function as a Head of Department within the management scheme of the Postal Service.

The government contends in its brief that "[t]he nine Governors of the Postal Service are the "head of department in the sense that they are the highest authority within the Postal Service." In my view, this cannot be correct. The nine-member Governors alone do not manage and govern the Postal Service; only the full eleven-member Board, of which the Governors comprise a part, is granted the authority under statute to "exercise the power of the Postal Service." 39 U.S.C. § 202(a). The Board, not the Governors alone, "shall direct and control the expenditures and review the practices and policies of the Postal Service." 39 U.S.C. § 205(a). It is the

Board that is given plenary power to delegate the authority vested in it to the PG. 39 U.S.C. § 402. Although the Governors alone vote on rate increases and new classes of mail, 39 U.S.C. § 3621, all other functions and powers of the Postal Service are directed by the full Board.

Under this statutory scheme, clearly the full Board governs and controls the Postal Service, and I am not persuaded that the Governors, a mere subset of the Board, can be regarded as the Head of Department. Hence the Governors alone cannot be empowered to appoint officers of the United States consistent with the Appointments Clause. The statutory scheme for appointment of the PG is unconstitutional because, in my view, it does not have as its source one of the only three options the Constitution permits: the President alone, the Courts of Law, or the Heads of Departments. Congress could not have intended nine members of the Board to be the head of department for Appointments Clause purposes while intending all eleven members to be head of department for purposes of running the Postal Service.

### C

The provision for appointment of the Deputy Postmaster General (the "DPG") is likewise flawed. The DPG is appointed by the Governors *and* the PG. By the reasoning applicable to the PG's selection, appointment of the DPG by the Governors alone would be inconsistent with the Appointments Clause. The additional participation of the PG, arguably an inferior officer, merely compounds the irregularity of the DPG's appointment process.

The DPG might not be subject to the Appointments Clause if, instead of being an inferior officer, he were a mere employee of the United States. *See Buckley,* 424 U.S. at 126, 96 S.Ct. at 685. All indications point, however, toward the DPG not being a mere employee. In *Buckley,* the Court

---

**3.** Although the Supreme Court has never addressed the question of whether a group, as opposed to an individual, could be a department head, many independent regulatory agencies are headed by groups with no apparent constitutional infirmity, and the Attorney General determined as early as 1933 that groups could be "Heads of Departments." *See* 37 Op. Att'y Gen. 227, 229–30 (1933).

defined employees in the Appointments Clause context as being "lesser functionaries subordinate to officers of the United States." *Buckley*, 424 U.S. at 126 n. 162, 96 S.Ct. at 685 n. 162. On the other hand, "any appointee exercising significant authority pursuant to the laws of the United States" must be appointed in the manner prescribed by the Appointments Clause. *Id.* at 126, 96 S.Ct. at 685.

The DPG is clearly not a "lesser functionary." The DPG by statute and regulation exercises significant authority.[4] He serves as an alternate to the PG when the PG cannot perform his duties. 39 U.S.C. § 203. He is chief operating officer of the Postal Service, 39 C.F.R. § 225.1, and the three Postal Service operations departments report to him, 39 C.F.R. § 225.2. Significantly, the DPG reports to the Board, not to the PG. *See* 39 C.F.R. § 224 (DPG is not on list of parties reporting to PG). Most important, the DPG serves as a voting member of the Board of the Postal Service. 39 U.S.C. § 202(d).

Justice Scalia has speculated that the DPG was likely an officer of the United States even as early as the administration of George Washington. *Freytag*, 111 S.Ct. at 2659 (Scalia, J., concurring in part and concurring in the judgment). And while the Supreme Court has never addressed whether the DPG is an officer of the United States, it has found the postmaster of Portland, Oregon, to be an officer of the United States. *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). *See also United States v. McCrory*, 91 F. 295 (5th Cir.1899) (letter carrier is officer of United States). Given the important role of the DPG in the statutory scheme of the Postal Service, the DPG cannot be a mere employee immune from the Appointments Clause.

## II

Although in my view the statute setting forth the appointment process for the PG and the DPG violates the Appointments Clause, the effect of this unconstitutionality on the enforcement action against Silver is initially unclear.[5] The PG and DPG were not personally involved in Silver's enforcement action. The PG and the DPG are, however, voting members of the Postal Service Board of Governors (39 U.S.C. § 202(d)) and thus the question remains what effect the existence of unconstitutionally appointed members has on that Board and therefore the Postal Service. As previously discussed, the power to execute the laws of the United States is lodged in the President. U.S. Const. art. II, § 3. In postal matters, that power is delegated to the Board. 39 U.S.C. § 202(a). They in turn are authorized to delegate their authority to the PG "as [the Board] deems desirable." 39 U.S.C. § 402. In the final link in the chain of delegation, the PG is permitted under Postal Service regulations to delegate "any function vested in the Postal Service, [or] in the [PG]" to "any employee or agent" of the Postal Service. 39 C.F.R. § 222.1.

Hence the constitutional power to execute the laws of the United States, if it is to be effective, must flow from the President through the Board and PG to the Judicial Officer and the ALJ involved in the Silver enforcement action. The Appointments Clause serves as a "limiting principle" on this flow of power, however. *See Freytag*, 111 S.Ct. at 2639. Executive authority cannot be handed down to those who hold office in violation of the Appointments Clause. *Buckley*, 424 U.S. at 140, 96 S.Ct. at 691.

Because the Board has members whose appointment violates the Appointments

---

**4.** In its determination that the appointee in question in *Freytag* was an inferior officer, the Court found it significant that the appointee's "duties, salary, and means of appointment ... are specified by statute." *Freytag*, 111 S.Ct. at 2640.

**5.** I adhere to the principle of finding unconstitutional as narrow and discrete a part of a statute

as possible. In my view, only those parts of section 202 concerning the appointment of the PG and the DPG, and not those parts concerning the appointment of the Governors, are unconstitutional. Even with this narrow conclusion, however, the implications of the flawed appointment of the PG and DPG on the Board as a whole must be explored.

Clause, in my view, the Board cannot exercise executive authority. The fact that the PG and the DPG are just two of the eleven members of the Board does not eliminate the constitutional infirmity. As a practical matter, the actions of the Board may be dependent on the PG and the DPG, as when they are needed to form a quorum, or where they cast the deciding votes. More fundamentally, the command of the Appointments Clause is not mere "etiquette or protocol," *Buckley*, 424 U.S. at 125, 96 S.Ct. at 685, and to allow powerful boards or commissions to be composed, even in part, by members appointed in an unconstitutional manner would vitiate the Appointments Clause.

This constitutional infirmity of the Board interrupts the chain of enforcement authority from the President to the Judicial Officer and ALJ. Because of its unconstitutional composition, the Board is bereft of any executive enforcement authority to delegate to the PG, let alone to the Judicial Officer and ALJ. Moreover, even if the Board were thought not to be undermined by the unconstitutionality of two of its members, the constitutional infirmity of the PG himself would still break the chain of authority from the President to the Postal Service Judicial Officer and ALJ.

The Appointments Clause speaks to "the fundamental principles of the Government established by the Framers of the Constitution, ... [to] the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." *Buckley*, 424 U.S. at 120, 96 S.Ct. at 682. "The Appointments Clause prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint. * * * The structural interests protected by the Appointments Clause are not those of any one Branch of government but of the entire Republic." *Freytag*, 111 S.Ct. at 2639. Given the profound interests at stake, even seemingly minor violations of the Appointments Clause cannot be ignored. I would reverse.