# United States Tax Court

164 T.C. No. 2

CHARLTON C. TOOKE III,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 398-21L.                                 Filed January 29, 2025.

————

P filed federal income tax returns for taxable years 2012 through 2017 but did not pay the tax. The Internal Revenue Service (IRS) assessed the tax and separately issued P a Notice of Federal Tax Lien Filing and a Final Notice of Intent to Levy. P timely requested a collection due process (CDP) hearing with the IRS Independent Office of Appeals (Appeals). During the CDP hearing, P raised constitutional arguments that Appeals, and the employees who work therein, serve in violation of the constitutional separation of powers, particularly the Appointments Clause; these arguments were rejected. The Appeals Officer prepared a draft Notice of Determination, which was subsequently reviewed and approved by the Appeals Team Manager.

Pursuant to I.R.C. § 6330(d)(1), P timely filed a Petition with the Tax Court. During this proceeding, P filed two Motions concerning the constitutional separation of powers and the CDP hearing before Appeals: (1) an Appointments Clause Motion, asserting that the Appeals Officers who conducted the CDP hearing, the Appeals Team Manager who reviewed and approved the Notice of Determination, and the Chief of Appeals (Chief), who the statutory scheme tasks with the "supervision and direction" of Appeals, *see* I.R.C. § 7803(e)(2)(A), but did not

**Served 01/29/25**

participate in the CDP hearing, each serve in violation of the Appointments Clause, *see* U.S. Const. art. II, § 2, cl. 2; and (2) a Separation of Powers Motion (Removal Power Motion), asserting that Appeals, codified by the Taxpayer First Act, Pub. L. No. 116-25, § 1001(a), 133 Stat. 981, 983 (2019) (codified at I.R.C. § 7803(e)(1)), is a de facto independent agency whose head, the Chief, a position also codified by the Taxpayer First Act § 1001(a), 133 Stat. at 983 (codified at I.R.C. § 7803(e)(2)(a)), is subject to an unlawful removal restriction.

*Held*: We reject P's "root-to-branch" theory of causation. P has not made the necessary showing that the Chief's tenure affected his hearing and prejudiced him in some way. *See, e.g.*, *United States v. Smith*, 962 F.3d 755 (4th Cir. 2020); *United States v. Castillo*, 772 F. App'x 11 (3d Cir. 2019).

*Held, further*, P has failed to establish each element of standing regarding the Chief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Therefore, P lacks standing to challenge the appointment and removal of the Chief.

*Held, further*, P's Appointments Clause Motion will be denied as to the Chief. P's Removal Power Motion will be denied.

*Held, further*, P has standing to challenge the appointments, or lack thereof, of Appeals Officers and Appeals Team Managers.

*Held, further*, following *Tucker v. Commissioner*, 135 T.C. 114 (2010), *aff'd*, 676 F.3d 1129 (D.C. Cir. 2012), Appeals Officers and Appeals Team Managers are not "Officers of the United States" and therefore do not need to be appointed within the mandates of the Appointments Clause. P's Appointments Clause Motion will be denied as to Appeals Officers and Appeals Team Managers.

———

*Joseph A. DiRuzzo III* and *Daniel M. Lader*, for petitioner.

*Kimberly A. Daigle*, *Lauren B. Epstein*, *Joshua P. Hershman*, *Christopher W. Jones*, and *Martha Jane Weber*, for respondent.

OPINION

JONES, *Judge*: In this collection due process (CDP) case, petitioner, Charlton C. Tooke III, asks this Court to review a Notice of Determination Concerning Collection Actions under IRC Sections 6320[1] or 6330 of the Internal Revenue Code (Notice of Determination), issued by the Internal Revenue Service (IRS) Independent Office of Appeals (Appeals) on January 5, 2021. The Notice of Determination sustained the filing of a Notice of Federal Tax Lien and proposed levy action.

The proposed collection actions stem from Mr. Tooke's self-assessed but unpaid federal individual income tax liabilities for taxable years 2012 through 2017. Mr. Tooke timely requested a section 6320 CDP lien hearing for taxable years 2013 through 2017 and a section 6330 CDP levy hearing for taxable years 2012 through 2017.

Currently before the Court, however, are two motions filed by Mr. Tooke: (1) Petitioner's Motion to Declare IRS Independent Office of Appeals, Appeals Officer(s) an "Officer of the United States" & Remand to the IRS Independent Office of Appeals (Appointments Clause Motion); and (2) Motion to Declare IRS Independent Office of Appeals Unconstitutional as Violating Separation of Powers & Set Aside IRS Independent Office of Appeals Actions (Removal Power Motion).

The Court may eventually review the merits of the underlying collection case, but the Motions currently pending before the Court present questions about neither Mr. Tooke's tax liabilities nor the collection decisions set forth in his Notice of Determination. Rather, Mr. Tooke presents questions about the constitutionality of the staffing of Appeals—including Appeals Officers, Appeals Team Managers, and the

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulatory references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

Chief of Appeals (Chief)—as well as the structure of the office in which they work.

In Mr. Tooke's Appointments Clause Motion, he asserts that the Appeals Officer who conducted his CDP hearing is an inferior "Officer of the United States" who must be appointed in a manner specified by the Appointments Clause. *See* U.S. Const. art. II, § 2, cl. 2. Further, Mr. Tooke contends that the Appeals Team Manager who reviewed and approved his Notice of Determination is a principal "Officer of the United States," as is the Chief who is responsible for supervising and directing Appeals. Therefore, Mr. Tooke contends that Appeals Team Managers and the Chief must be nominated by the President and confirmed with the advice and consent of the Senate. *See id.*

This Court has held that the positions of Appeals Officer and Appeals Team Manager are not statutorily created, and their occupants need not be appointed in a manner prescribed by the Appointments Clause. *See Tucker v. Commissioner* (*Tucker I*), 135 T.C. 114, 152–56, 165 (2010), *aff'd*, *Tucker v. Commissioner* (*Tucker II*), 676 F.3d 1129 (D.C. Cir. 2012). At present, Appeals Officers and Appeals Team Managers are hired pursuant to the Commissioner's general hiring authority under section 7804(a), *see Tucker I*, 135 T.C. at 153, and the Chief was appointed by the Commissioner pursuant to section 7803(e)(2)(B). Pursuant to his theory that Appeals Officers, Appeals Team Managers, and the Chief are "Officers of the United States" improperly appointed, Mr. Tooke asks the Court to "set aside all action[s] taken by such unconstitutional actors as void *ab initio*" and to remand his case to Appeals for a constitutionally compliant proceeding.

In Mr. Tooke's Removal Power Motion, he contends that the Chief is removable only for such cause as will promote the efficiency of the service, *see* 5 U.S.C. § 7513, and argues that the removal restriction is an unlawful restraint on the President's removal authority that "severely restricts executive oversight and accountability to the people." Mr. Tooke urges this Court to "set aside all agency actions as ultra vires."

For the reasons elaborated upon below, we find that Mr. Tooke lacks standing to challenge the Chief's appointment under the Appointments Clause or his removal under separation of powers principles. As to Appeals Officers and Appeals Team Managers, we find that Mr. Tooke has standing to challenge their appointments. On the

merits, we follow *Tucker I* in its conclusion that such personnel are not Officers of the United States. Accordingly, we will deny both Motions.

*Background*

The following background information is drawn from the parties' pleadings and Motion papers, including the corresponding declarations and Exhibits attached thereto. *See* Rule 121(c).[2] This background is stated solely for the purpose of resolving the present Motions and not as findings of fact in this case. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). Mr. Tooke resided in Florida when he filed his Petition.

I. *Mr. Tooke's Collection Due Process Hearing*

Mr. Tooke is liable for self-assessed but unpaid federal individual income tax for taxable years 2012 through 2017. On March 21, 2019, the IRS issued Mr. Tooke a Final Notice of Intent to Levy that advised him of his right to a hearing pursuant to section 6330. Mr. Tooke submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing, dated April 20, 2019, which the IRS received on April 25, 2019. Mr. Tooke timely requested a section 6330 CDP levy hearing for taxable years 2012 through 2017. Therein, Mr. Tooke requested collection alternatives to the proposed levy action.

The IRS also recorded a federal tax lien and issued a Notice of Federal Tax Lien Filing, dated April 2, 2019, that advised Mr. Tooke of his right to a hearing pursuant to section 6320. Mr. Tooke submitted Form 12153, dated April 27, 2019, which the IRS received on April 29, 2019. Mr. Tooke timely requested a section 6320 CDP lien hearing for taxable years 2013 through 2017. Therein, Mr. Tooke requested collection alternatives to the federal tax lien.

Appeals Officer Kay Pollock (AO Pollock) was initially assigned to consider Mr. Tooke's requests for CDP hearings. AO Pollock was assigned the task of conducting Mr. Tooke's section 6330 CDP levy hearing on or about July 16, 2019, and was subsequently assigned the

---

[2] Mr. Tooke's Appointments Clause Motion and Removal Power Motion are styled as motions for judgment on the pleadings. However, Rule 120(b) provides that if matters outside of the pleadings are presented, then a motion for judgment on the pleadings shall be treated as a motion for summary judgment under Rule 121. The Court has considered the declarations and accompanying Exhibits filed by respondent in this case. Accordingly, we dispose of the instant Motions under Rule 121.

task of conducting his section 6320 CDP lien hearing on or about September 26, 2019.[3] On or about July 1, 2020, Mr. Tooke's CDP hearing was transferred to Appeals Officer Nathan Herring (AO Herring), who held several calls with Mr. Tooke's representative to discuss the CDP notices and to consider various collection alternatives. Mr. Tooke's proposed offer-in-compromise (OIC) was rejected, and the parties were unable to come to terms on an installment agreement (IA).

Near the conclusion of his CDP hearing, Mr. Tooke raised constitutional arguments regarding the separation of powers, particularly the Appointments Clause. Mr. Tooke urged AO Herring to stay the administrative proceeding until the alleged constitutional defects were remedied. In response, AO Herring explained that he would not consider any frivolous issues.

AO Herring prepared the draft Notice of Determination that was subsequently reviewed and approved by Appeals Team Manager Rhonda R. Warren (ATM Warren). On January 5, 2021, ATM Warren issued Mr. Tooke the Notice of Determination that constitutes the basis of the present action. The Notice of Determination sustained the federal tax lien and the proposed levy action. There is no indication in the Notice of Determination or the broader record before the Court that the Chief participated in Mr. Tooke's CDP hearing.

## II.    *Instant Proceedings Before the Tax Court*

On January 29, 2021, Mr. Tooke timely filed a Petition with this Court, seeking review of the Notice of Determination. Mr. Tooke resided in Florida when he timely filed the Petition.[4] Respondent filed an Answer on March 12, 2021.

Thereafter, Mr. Tooke filed his Appointments Clause Motion. Respondent filed an Objection to Mr. Tooke's Appointments Clause Motion and the Declaration of Michelle C. Haines in support of the Objection. Mr. Tooke filed a Reply to respondent's Objection.

---

[3] Mr. Tooke's requests for a section 6320 lien hearing and a section 6330 levy hearing were combined, and one hearing was conducted. *See* Treas. Reg. §§ 301.6320-1(d)(2), Q&A-D2 and D3, 301.6330-1(d)(2), Q&A-D2 and D3. Accordingly, we will refer to the combined hearings as the CDP hearing.

[4] Absent a stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Eleventh Circuit. *See* § 7482(b)(1)(G)(i), (2).

Further, Mr. Tooke filed his Removal Power Motion, and respondent filed an Objection thereto. Subsequently, Mr. Tooke lodged a Notice of Supplemental Authority, which was accepted for filing by Order of the Court. Respondent then filed a Response to Notice of Supplemental Authority.

Additionally, briefing ensued addressing whether Mr. Tooke has standing to raise the issue of the appointment of the Chief, and if so, the appropriate remedy. We subsequently held a hearing (oral argument) on the Motions.[5]

*Discussion*

The Motions currently before the Court ask us both to consider issues of first impression and to reconsider issues that this Court has previously addressed. *See, e.g.*, *Tucker I*, 135 T.C. 114; *Fonticiella v. Commissioner*, T.C. Memo. 2019-74. Therefore, we must consider Mr. Tooke's Motions—and the constitutional arguments presented therein—in light of recent amendments to the law and recent jurisprudential developments, including those occurring since we last considered similar issues. First, we will discuss the history, function, and legal authorities for Appeals. Then we will discuss the separation of powers doctrine, including the appointment and removal of executive officers. Then we will address standing, and finally we will consider classification under the Appointments Clause.

## I.  *IRS Independent Office of Appeals*

The "Internal Revenue Service Independent Office of Appeals," in its current form, exists pursuant to the amendments to the law enacted as part of the Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983–85 (2019). However, Appeals has a long history and has operated under many names, adopted various structures, and existed pursuant to several authorities throughout the years. *Tucker I*, 135 T.C. at 135–36.

### A.  *A Brief History of the Independent Office of Appeals*

Established by the Revenue Act of 1918, ch. 18, § 1301(d), 40 Stat. 1057, 1141, the Advisory Tax Board was the first iteration of the office that we now know as Appeals. All decisions of the Advisory Tax Board

---

[5] We will refer to the hearing we held, *see* Doc. 33, as the "oral argument" to avoid any confusion with the administrative hearing conducted by Appeals.

were subject to review by the Commissioner. IRS Document 7225, History of Appeals, 60th Anniversary Edition 3 (Nov. 1987). However, the Advisory Tax Board was short lived, and it was quickly replaced by the administratively created Committee on Appeals and Review. *Id.* Soon thereafter, the Revenue Act of 1921, ch. 136, § 250(d), 42 Stat. 227, 265–66, augmented the authority of the Committee on Appeals and Review by granting the committee the authority to hear administrative appeals from taxpayers and to redetermine their deficiencies.

Relatively soon after its inception, the Committee on Appeals and Review was replaced by the Board of Tax Appeals, the predecessor to this Court.[6] Revenue Act of 1924, ch. 234, § 900(a), 43 Stat. 253, 336; *see also* IRS Document 7225, *supra*, at 3. The Board of Tax Appeals was created with the aim of providing a tribunal to resolve taxpayer disputes and it was structured as an independent agency within the executive branch. Revenue Act of 1924 § 900(k), 43 Stat. at 338; *see also* IRS Document 7225, *supra*, at 3.

However, in the late 1920s, on account of the rapidly expanding docket of the Board of Tax Appeals, a new dispute resolution forum was created. IRS Document 7225, *supra*, at 3. In 1927, the Special Advisory Committee was formed as part of the Commissioner's Office to reprise the role of the Committee on Appeals and Review. *Id.* The Special Advisory Committee was the foundation for the Appeals office that exists today. *See Tucker I*, 135 T.C. at 136 n.49. Since then, the Special Advisory Committee has changed names several times and has been known as the "Technical Staff," the "Appellate Staff," the "Appellate Division," the "Appeals Division," and the "Office of Appeals." IRS Document 7225, *supra*, at 1–2; *see also, e.g., Tucker I*, 135 T.C. at 135–36; Statement of Procedural Rules, 26 C.F.R. § 601.106(e)(1). However, regardless of its name, structure, or authority, Appeals and its predecessors have long had the same mission: to resolve tax

---

[6] Under the Revenue Act of 1926, ch. 27, § 1000, 44 Stat. 9, 105–09, the Board of Tax Appeals adopted a statutory structure similar to that of the Court today, although the Board remained an independent agency within the executive branch. In 1942, while still retaining its status as an independent agency, the Board became known as the Tax Court of the United States, and its members denominated judges. Revenue Act of 1942, ch. 619, § 504(a), 56 Stat. 798, 957; *see also* Harold Dubroff & Brant J. Hellwig, *The United States Tax Court: An Historical Analysis* 175, 186–95 (2d ed. 2014).

In 1969, Congress established this Court under Article I as a court of public record and renamed it the United States Tax Court. Tax Reform Act of 1969, Pub. L. No. 91-172, § 951, 83 Stat. 487, 730.

controversies without litigation. *See* § 7803(e)(3); *see also Tucker I*, 135 T.C. at 136 (citing IRS Document 7225, *supra*, at 3–6).

Before the enactment of the CDP regime, Appeals operated primarily pursuant to regulation. *See Tucker I*, 135 T.C. at 134–36, 153 n.69 (noting that Appeals was "originally a creature of regulation"); *Fonticiella*, T.C. Memo. 2019-74, at *6 n.3 (same). However, in 1998 Congress passed the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. No. 105-206, § 1001(a)(4), 112 Stat. 685, 689 (1998), which sought to "ensure an independent appeals function within the Internal Revenue Service." As this Court explained in *Tucker I*, the predecessor to modern-day Appeals was a component of the IRS within the Department of the Treasury. *Tucker I*, 135 T.C. at 134–35. Congress committed the prior-existing Office of Appeals to carry out the new CDP function, but that office was not created by the CDP provisions (i.e., sections 6320 and 6330), nor any other provisions enacted as part of the RRA. *Tucker I*, 135 T.C. at 134–35. Although certain provisions of the Code required independent administrative review, the provisions of the RRA presumed the prior existence of the Office of Appeals within the IRS. *See, e.g.*, RRA § 1001(a)(4). The President retained full oversight of the Commissioner pursuant to section 7803(a), and the Commissioner, in turn, exercised his delegated authority under section 7804 to accomplish the duties and mission of the IRS, including the appeals function. *Fonticiella*, T.C. Memo. 2019-74, at *11.

### B.    *Modern-Day Independent Office of Appeals*

#### 1.    *Legal Basis for the Independent Office of Appeals*

While the RRA presumed the prior existence of Appeals, the amendments to the law enacted as part of the Taxpayer First Act, § 1001(a), 133 Stat. at 983–85 (codified at § 7803(e)), formally established a statutory basis for the office. Therein, the Taxpayer First Act provides that "[t]here is established in the Internal Revenue Service an office to be known as the 'Internal Revenue Service Independent Office of Appeals'." *Id.* at 983; *see also* § 7803(e)(1).

Section 7803(e)(3), reciting the purpose and duties of Appeals, provides:

> It shall be the function of the Internal Revenue Service Independent Office of Appeals to resolve Federal tax controversies without litigation on a basis which—

>>(A) is fair and impartial to both the Government and the taxpayer,

>>(B) promotes a consistent application and interpretation of, and voluntary compliance with, the Federal tax laws, and

>>(C) enhances public confidence in the integrity and efficiency of the Internal Revenue Service.

The Appeals resolution process shall be "generally available to all taxpayers." § 7803(e)(4). *But see Rocky Branch Timberlands LLC v. United States*, No. 22-12646, 2023 WL 5746600, at *2 (11th Cir. Sept. 6, 2023) (per curiam) (rejecting a taxpayer's claim that the IRS violated section 7803(e)(4) when the IRS denied a taxpayer's request for an administrative appeal before issuing a Notice of Final Partnership Administrative Adjustment). The Taxpayer First Act also codified the position of the Chief, as discussed further *infra* Part I.B.2.c.

Appeals is unique as it derives its authority from multiple sources within the IRS. Among other authorities, Appeals is delegated the authority vested in the Commissioner to "[d]etermine liability, qualification, exempt status, or foundation classification for any case not docketed in the Tax Court where the taxpayer does not agree with the determination made by the originating function, and the taxpayer requests consideration by Appeals." *Internal Revenue Manual* (IRM) 1.2.2.9.8(2)(b) (Mar. 29, 2017).[7] Appeals is also delegated the authority to settle such cases. IRM 1.2.2.9.8(2)(a).

Further, the Commissioner and the Chief Counsel have each delegated Appeals the "exclusive jurisdiction to settle in whole or part . . . cases docketed in the Tax Court," unless otherwise provided. IRM 1.2.2.9.1(2)(b) (May 5, 1994); *see also* Rev. Proc. 2016-22, § 3.01, 2016-15 I.R.B. 577, 578 (outlining when cases are sent to Appeals for settlement). Further, for CDP cases, sections 6320(b)(1) and 6330(b)(1) grant Appeals the authority to hold CDP hearings. *See Organic Cannabis Found., LLC v. Commissioner*, 161 T.C. 13, 19 (2023) ("Section 6320(b)(1) provides the

---

[7] "The IRM [does not] have the force of law or confer substantive rights on taxpayers. It does, however, govern the internal affairs and administration of the IRS, and reliably describes the functions delegated to the different offices within the IRS." *DelPonte v. Commissioner*, 158 T.C. 159, 161 n.4 (2022) (citing *United States v. McKee*, 192 F.3d 535, 540 (6th Cir. 1999)).

procedural steps that the taxpayer must take to obtain a CDP hearing and also grants authority to Appeals to hold a hearing.").

For purposes of sections 6320 and 6330, "[a] CDP hearing may, but is not required to, consist of a face-to-face meeting, one or more written or oral communications between an Appeals officer or employee and the taxpayer or the taxpayer's representative, or some combination thereof." Treas. Reg. §§ 301.6320-1(d)(2), Q&A-D6, 301.6330-1(d)(2), Q&A-D6. "If no face-to-face or telephonic conference is held, or other oral communication takes place, review of the documents in the case file, as described in A–F4 of paragraph (f)(2), will constitute the CDP hearing . . . ." Treas. Reg. §§ 301.6320-1(d)(2), Q&A-D7, 301.6330-1(d)(2), Q&A-D7.

### 2. *Positions in the Independent Office of Appeals*

In this context, we will examine three types of employees that play a role in administering hearings before Appeals: Appeals Officers, Appeals Team Managers, and the Chief.

### a. *Appeals Officer, Generally*

The position of Appeals Officer was internally created by the IRS and has existed within Appeals (or its predecessors) since 1978. *Tucker I*, 135 T.C. at 136 (citing IRS Document 7225, *supra*, at 3–5). Under current practices, Appeals Officers "conduct hearings by considering issues and alternatives to collection action in CDP cases. [Appeals Officers] are generally specialized to work either Examination or Collection issues." IRM 8.22.4.5.1(1) (Aug. 26, 2020). An Appeals Officer "works cases with issues ranging from the simplest to the most complex, and from few to millions of dollars." IRM 8.1.3.4(1) (Oct. 23, 2007).[8]

---

[8] The Court notes that the IRM provision in effect at the time of Mr. Tooke's CDP hearing was IRM 8.1.3.4. *See* IRS Manual Transmittal 8.1.3 (Jan. 5, 2015). This IRM provision was subsequently renumbered from IRM 8.1.3.4 to IRM 8.1.3.5. *See* IRS Manual Transmittal 8.1.3 (Jan. 12, 2024). The version in effect at the time of Mr. Tooke's CDP hearing and the latest revision are substantively identical and bear the same effective date of October 23, 2007. To avoid confusion, in this instance and throughout the Opinion, we refer to the IRM and corresponding provision in effect at the time of Mr. Tooke's CDP hearing.

b.     *Appeals Team Manager, Generally*

An Appeals Team Manager "plans, organizes, leads, and evaluates a team of [Appeals Technical Employees[9]] and appropriately supports personnel engaged in the hearing, negotiation, and settlement of taxpayer appeals." IRM 1.4.28.1.3(4) (Dec. 30, 2019). An Appeals Team Manager has "supervisory responsibilities for Appeals Officers and . . . review[s] cases for completeness, accuracy and decision quality. [Appeals Team Managers] have approval authority in most CDP cases." IRM 8.22.4.5.3(1) (Sept. 25, 2014) (citing IRM Exhibit 8.22.4-1). Appeals Team Managers are also "responsible for monitoring compliance with ex parte communication requirements."[10] IRM 8.22.4.5.3(2).

Appeals Team Managers have the authority to approve many "case settlements . . . [while also] ensuring team member settlements and team objectives comply with Appeals vision and values." IRM 1.4.28.1.3(4). Appeals Team Managers report to Appeals Area Directors and they have "full accountability for the overall team success in delivering and balancing customer satisfaction, employee satisfaction, and business results." *Id.*

c.     *Chief of Appeals, Generally*

In addition to providing a specific statutory basis for Appeals, the Taxpayer First Act codified the position of the Chief. *See* Taxpayer First Act § 1001(a). Subsection (e)(2)(A) of section 7803 provides:

> The Internal Revenue Service Independent Office of Appeals shall be under the supervision and direction of an official to be known as the "Chief of Appeals". The Chief of Appeals shall report directly to the Commissioner of Internal Revenue and shall be entitled to compensation at the same rate as the highest rate of basic pay established

---

[9] "Appeals Technical Employee is an umbrella term used to refer generally to any Appeals employee who is assigned a case for settlement consideration (generally, an Exam [Appeals Officer], Collection [Appeals Officer] or [Appeals Account Resolution Specialist]." IRM Exhibit 8.22.4-3 (Aug. 26, 2020) (Common Terms and Acronyms Used in Collection Due Process); *see also* IRM 8.22.4.1.5 (Aug. 26, 2020).

[10] Appeals employees are generally prohibited from engaging in ex parte communications with IRS employees working in functions other than Appeals. *See* Rev. Proc. 2012-18, 2012-10 I.R.B. 455; *see also* IRM 8.1.10.1 (Sept. 28, 2017).

for the Senior Executive Service under section 5382 of title 5, United States Code.

The Chief "shall be appointed by the Commissioner of Internal Revenue without regard to the provisions of title 5, United States Code, relating to appointments in the competitive service or the Senior Executive Service." § 7803(e)(2)(B). Further, "[a]ll personnel in the Internal Revenue Service Independent Office of Appeals shall report to the Chief of Appeals." § 7803(e)(6)(A).

We examine Mr. Tooke's Motions against this background.

II. *Separation of Powers—Appointment and Removal of Executive Officers*

The former British colonies had suffered "a long train of abuses and usurpations" by the British monarch, including the erection of a "multitude of New Offices" and the sending of "swarms of Officers to harrass [sic] our People, and eat out their substance." The Declaration of Independence, para. 2 (U.S. 1776); *see also Tucker I*, 135 T.C. at 120. Thereafter, the Framers of the United States Constitution saw it necessary to protect the people against tyranny by providing for three divided powers of the Federal Government: legislative, executive, and judicial. *See Tucker I*, 135 T.C. at 120.

Among these structural safeguards in the Constitution is the Appointments Clause. *See, e.g.*, *Freytag v. Commissioner*, 501 U.S. 868, 873 (1991) ("We granted certiorari . . . to resolve the important questions the litigation raises about the Constitution's structural separation of powers."). "[T]he Appointments Clause of Article II is more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125 (1976) (per curiam)). The Appointments Clause provides "the exclusive means of appointing 'Officers.'" *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018). "The principle of separation of powers is embedded in the Appointments Clause," *Freytag v. Commissioner*, 501 U.S. at 882, which, among other purposes, "prevents Congress from dispensing power too freely," *id.* at 880; *see also Tucker I*, 135 T.C. at 120–22. The Appointments Clause provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the

[S]upreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

Mr. Tooke asserts that the Appeals Officers who conducted his CDP hearing, the Appeals Team Manager who reviewed and approved his determination, and the Chief who supervised and directed Appeals are all "Officers of the United States" who must be appointed in accordance with the Appointments Clause. In examining this question, "[t]he nature of each government position must be assessed on its own merits." *Silver v. U.S. Postal Service*, 951 F.2d 1033, 1040 (9th Cir. 1991).

In addition to his Appointments Clause challenges, Mr. Tooke insists that the Chief's position presents another separation of powers problem. He alleges that the Chief is removable only for such cause as will promote the efficiency of the service, *see* 5 U.S.C. § 7513, and contends that this arrangement constitutes an unlawful restraint on the President's removal authority.

As the Supreme Court has explained:

The removal of executive officers was discussed extensively in Congress when the first executive departments were created. The view that "prevailed, as most consonant to the text of the Constitution" and "to the requisite responsibility and harmony in the Executive Department," was that the executive power included a power to oversee executive officers through removal; because that traditional executive power was not "expressly taken away, it remained with the President."

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 *Documentary History of the First Federal Congress* 893 (2004)). Further, "[t]his Decision of 1789 provides contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that

instrument." *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 723–24 (1986)). Accordingly, it soon became the "settled and well understood construction of the Constitution." *Id.* (quoting *Ex parte Hennen*, 38 U.S. (13 Pet.) 230 (1839)). To be sure, the separation of powers is deeply rooted in our history and integral to our constitutional scheme.

To properly consider Mr. Tooke's contentions, we will first address the issue of standing. Finding that he lacks standing to challenge the appointment and removal of the Chief, we will deny in part Mr. Tooke's Appointments Clause Motion and, in full, his Removal Power Motion. Then, finding that Mr. Tooke has standing to challenge the appointment of Appeals Officers and Appeals Team Managers, we will discuss the general framework for classifying individuals under the Appointments Clause. Next, we will provide an overview of the parties' arguments regarding Appeals Officers and Appeals Team Managers. Finally, we confirm the classification of these positions under the Appointments Clause.

III.    *Standing*

Before proceeding to the merits, we must address the issue of standing. From Article III's limitation of the judicial power to resolving "Cases" and "Controversies," and the separation of powers principles underlying that limitation, the Supreme Court has deduced a set of requirements that together make up the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Typically, . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

Although the Tax Court is not an Article III Court, *see, e.g.*, *Freytag v. Commissioner*, 501 U.S. at 887–88, the "cases" or "controversies" requirement under Article III still presumptively applies, *Ruesch v. Commissioner*, 25 F.4th 67, 70 (2d Cir. 2022), *aff'g in part, vacating in part and remanding per curiam* 154 T.C. 289 (2020); *see also Battat v. Commissioner*, 148 T.C. 32, 46 (2017) (collecting cases). The application of that requirement is not a constitutional mandate, but rather is one derived from caselaw. *Battat*, 148 T.C. at 46 (first citing *Baranowicz v. Commissioner*, 432 F.3d 972, 975 (9th Cir. 2005); and then citing *Orum v. Commissioner*, 412 F.3d 819, 821 (7th Cir. 2005), *aff'g* 123 T.C. 1 (2004)).

The instant standing inquiry is not whether Mr. Tooke has the right to challenge the CDP determination he received, which conferred jurisdiction on this Court. The answer to that question is yes. *See* §§ 6320(c), 6330(d)(1); *see also, e.g.*, *Luniw v. Commissioner*, T.C. Memo. 2023-49, at \*3 (citing *Murphy v. Commissioner*, 125 T.C. 301, 308 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006)). Rather, the question is whether Mr. Tooke has standing to challenge the appointment of Appeals Officers and Appeals Team Managers, and the appointment and removal of the Chief.

As the petitioner, Mr. Tooke bears the burden of proving that he has standing to raise the Appointments Clause challenges to Appeals Officers, Appeals Team Managers, and the Chief. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). He also bears the burden of demonstrating that he has standing to bring a removal power challenge regarding the Chief. *Id.* A plaintiff must demonstrate standing as to each claim and type of relief. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "[S]tanding principles do not permit [p]laintiffs to challenge an unlawful appointment generally, or to challenge future exercises of unlawful authority. Plaintiffs' injuries must be traceable to government *action.*" *Braidwood Mgmt. Inc. v. Becerra*, 627 F. Supp. 3d 624, 641 (N.D. Tex. 2022), *aff'd in part, rev'd in part on other grounds and remanded*, 104 F.4th 930 (5th Cir. 2024).

The Supreme Court has established that at an irreducible constitutional minimum, standing requires three elements: (1) an "injury in fact," meaning an invasion of a legally protected interest that is "concrete and particularized" and actual or imminent, not conjectural or hypothetical; (2) causation, meaning that the injury is "fairly . . . trace[able]" to the challenged action of the defendant; and (3) redressability, meaning that the injury is "likely" to be "redressed by a favorable decision" of this Court. *Defenders of Wildlife*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41 (1976)); *see also* 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4, Westlaw (database updated June 2024) ("Even as the concepts blend together, however, the central focus is fixed on the injury requirement. The very notion of injury implies a causal connection to the challenged activity; an injury caused by other events is irrelevant to any purpose of standing doctrine. Causation in turn bears on remedial benefit, since a remedy addressed to actions that have not caused the injury will not alleviate the injury. It remains useful nonetheless to separate the three elements, both for purposes of exposition and for purposes of decision.").

For the purpose of our standing inquiry, we assume that Appeals Officers, Appeals Team Managers, and the Chief are Officers of the United States. *See Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (citing *Warth v. Seldin*, 422 U.S. 490, 501–02 (1975)))).

The Supreme Court has not expressly addressed whether a plaintiff has standing to bring a separation of powers challenge—such as the Appointments Clause and Removal Power Motions by Mr. Tooke—against an official who did not participate in the plaintiff's case. The record is clear that AO Herring and ATM Warren conducted Mr. Tooke's hearing and issued the Notice of Determination; there is no question that they participated in the administrative proceeding.

But it is equally undisputed that the record evinces no participation by the Chief. To be sure, it is possible for the Chief to participate in a CDP case. *See, e.g.*, IRM 8.22.8.14.4(1) and (2) (Aug. 26, 2020) (stating that the Chief holds sole approval authority over settlement of certain tax shelter cases and related cases in which a taxpayer who filed a joint return requests relief from joint and several liability). This is not such a case.

Gleaning and extrapolating from the principles set forth in the available guidance, the throughline is that a plaintiff's standing to challenge an official's appointment or removal hinges on whether that official participated in the plaintiff's case. With this understanding, we will address each standing requirement in turn.

A. *Is There An "Actual or Imminent" and "Concrete and Particularized" Injury?*

We begin by identifying the injury, to the extent one exists. Assuming arguendo that Mr. Tooke will succeed on the merits, *see Tanner-Brown*, 105 F.4th at 445, we find that Mr. Tooke suffered an injury in fact with respect to the hearing conducted by AO Herring and ATM Warren, but that he has suffered no injury at the hands of the Chief.

Mr. Tooke is the object of IRS collection actions; the IRS issued a Final Notice of Intent to Levy and a Notice of Federal Tax Lien Filing. Mr. Tooke requested an administrative CDP hearing, during which he

proposed an OIC that was rejected. Although AO Herring offered Mr. Tooke an IA, the parties were unable to reach the terms of an agreement. Ultimately, AO Herring drafted the Notice of Determination sustaining the federal tax lien and the proposed levy action. The Notice of Determination was subsequently reviewed and approved by ATM Warren. The Chief did not participate and was not involved in Mr. Tooke's CDP hearing. With this background we will address injury as it relates to Appeals Officers and Appeals Team Managers, and then we will address the same with respect to the Chief.

1.     *Appeals Officers and Appeals Team Managers*

When plaintiffs have brought appointments challenges against the officials who adjudicated their cases, the Supreme Court has indicated that the injury is the administrative proceeding conducted by officials improperly appointed. Accordingly, the Supreme Court has consistently resolved the merits with little or no mention of standing. This track record counsels that the conduct of Mr. Tooke's hearing by Officers of the United States who were not appointed in conformity with the Appointments Clause constitutes an actual, concrete, and particularized injury to Mr. Tooke.

For example, in *Lucia*, 138 S. Ct. at 2049–50, the plaintiff successfully challenged the appointment of the administrative law judge (ALJ) who conducted his hearing. The Supreme Court noted that in such cases "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Id.* at 2055–56 (quoting *Ryder v. United States*, 515 U.S. 177, 183, 188 (1995)). *Lucia's* comment on the remedy elucidates the injury. If the "appropriate remedy" is a new hearing with a constitutionally appointed officer, logic dictates that the injury being cured is the tainted adjudication, the administrative proceeding conducted by the improperly appointed officer.

In *Ryder*, 515 U.S. at 179, the plaintiff challenged the composition of the three-judge panel that heard the appeal of his case in a military court by arguing that the appointment of two of the judges violated the Appointments Clause. The Supreme Court observed that "one who makes a timely challenge to the constitutional validity of the appointment of an officer *who adjudicates his case* is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred." *Id.* at 182–83 (emphasis added).

Similarly in *Freytag v. Commissioner*, 501 U.S. at 871–72, plaintiffs challenged the appointment of the Special Trial Judge (STJ) who served as their "evidentiary referee," presided over their trial, and prepared findings and an opinion. The Supreme Court concluded that the STJ was an inferior officer before succinctly rejecting the Commissioner's challenge to plaintiffs' standing. *Id.* at 881–82.

AO Herring's and ATM Warren's actions closely resemble those of the ALJ in *Lucia*, the two military judges in *Ryder*, and the STJ in *Freytag*. The ALJ in *Lucia*, 138 S. Ct. at 2050, conducted the hearing before he issued an initial decision that imposed sanctions and a revised decision, which included additional findings with the same sanctions. In *Ryder*, 515 U.S. at 179, the judges heard the case and issued an opinion that affirmed the conviction. Similarly, the STJ in *Freytag v. Commissioner*, 501 U.S. at 871–72, resolved evidentiary disputes, presided over the plaintiffs' trial, and prepared findings and an opinion. Like the ALJ in *Lucia*, the judges in *Ryder*, and the STJ in *Freytag*, AO Herring conducted the hearing and drafted the decision document, the Notice of Determination. ATM Warren's review and approval completed the hearing and facilitated issuance of the Notice of Determination in a fashion similar to the issuance of the decision in *Lucia* and the opinions in *Ryder* and *Freytag*. Given AO Herring's and ATM Warren's actions, we find that they adjudicated Mr. Tooke's case. *See Ryder*, 515 U.S. at 182–83; *Freytag v. Commissioner*, 501 U.S. at 871–72. Assuming arguendo that Appeals Officers and Appeals Team Managers are improperly appointed Officers of the United States, *see Tanner-Brown*, 105 F.4th at 445, it easily follows that Mr. Tooke suffered an actual injury on account of their actions, *see Lucia*, 138 S. Ct. at 2055–56; *Ryder*, 515 U.S. at 182–83.[11]

---

[11] It might be appropriate to stop the standing analysis as to Appeals Officers and Appeals Team Managers here. For in *Lucia*, the Supreme Court said that "[t]he only way to defeat [the plaintiff's] position is to show that those ALJs are not officers at all, but instead non-officer employees—part of the broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 138 S. Ct. at 2051 (quoting *Buckley*, 424 U.S. at 126 n.162). If winning on the merits is "[t]he only way to defeat" a timely Appointments Clause challenge, *id.*, brought by a plaintiff who questions the appointment of an officer who adjudicates his case, *Ryder*, 515 U.S. at 182–83, then standing cannot resolve the matter. Nevertheless, in light of the comprehensive nature of Mr. Tooke's challenge—and for the sake of completeness, *see Mukhi v. Commissioner*, No. 4329-22L, 163 T.C., slip op. at 13 (Nov. 18, 2024)—we think it prudent to address the causation and redressability elements.

## 2.  *Chief of Appeals*

*Lucia*, *Ryder*, and *Freytag*, which arose in the context of Appointments Clause challenges, indicate that plaintiffs easily satisfy the injury in fact requirement when challenging the appointments of the officials who hear their cases. The same is true in the context of other separation of powers challenges, such as those asserting that the President's removal authority has been unconstitutionally undermined. Mr. Tooke challenges the constitutionality of both the appointment and removal of the Chief.

On the appointment challenge, the instant case differs in significant respects from *Lucia*, *Ryder*, and *Freytag*. Unlike the officials in *Lucia*, *Ryder*, and *Freytag*, who conducted the proceedings, the Chief did not participate in Mr. Tooke's hearing. Given the Chief's lack of participation, we conclude that the Chief did not injure Mr. Tooke.

Countervailing sentiments from other courts do not countenance a different result. For example, in *Landry v. FDIC*, 204 F.3d 1125, 1128 (D.C. Cir. 2000), the plaintiff brought an Appointments Clause challenge against the ALJ who conducted his hearing and issued a decision recommending an order of prohibition against him.[12] While not explicitly ruling on standing or the actual injury requirement, the U.S. Court of Appeals for the D.C. Circuit offered dictum that "judicial review of an Appointments Clause claim will proceed even where any possible injury is radically attenuated." *Id.* at 1131. The court further suggested that the Supreme Court's treatment of separation of powers issues as "structural" obviates the need for a direct injury in an Appointments Clause challenge. *Id.* at 1130. While it might be argued that such dicta in *Landry* warrants the finding of an injury in fact as to the Chief—or the conclusion that no injury need be shown—we believe such reliance would be misplaced.

The context in which the Appointments Clause challenge arose in *Landry* was that of a plaintiff challenging the appointment of the ALJ who adjudicated his case. *Id.* at 1128; *see Ryder*, 515 U.S. at 182–83. And almost every case that the court cited in *Landry* in support of its injury-related comments arose in the context of a plaintiff challenging the constitutionality or legality of the official or tribunal that adjudicated

---

[12] While we address *Landry's* comments on standing, we note that *Landry's* merits decision has been undermined by recent jurisprudential developments. *See, e.g.*, *Lucia*, 138 S. Ct. 2044; *see also Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017).

his case. *Landry*, 204 F.3d at 1131–32; *see Vasquez v. Hillery*, 474 U.S. 254, 255–56 (1986) (holding that plaintiff was indicted by a grand jury from which blacks were systematically excluded); *Ballard v. United States*, 329 U.S. 187, 189–90 (1946) (holding that plaintiffs were indicted, tried, and found guilty in a federal district in which women were intentionally and systematically excluded from the panel of grand and petit jurors); *United States v. Mechanik*, 475 U.S. 66, 70–71 & n.1 (1986) (holding that plaintiffs were indicted by a grand jury following simultaneous testimony of two witnesses in violation of Federal Rule of Criminal Procedure 6(d)); *Freytag v. Commissioner*, 501 U.S. at 871–72 (challenging the appointment of the STJ who served as plaintiffs' "evidentiary referee," presided over their trial, and prepared findings and an opinion); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 56–57 (1982) (challenging the authority of the Bankruptcy Judge who denied the plaintiff's motion to dismiss), *superseded by statute*, Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333; *Palmore v. United States*, 411 U.S. 389, 391–93 (1973) (challenging the authority of the District of Columbia Superior Court judge who tried the plaintiff's case and found him guilty); *Crowell v. Benson*, 285 U.S. 22, 36–37 (1932) (challenging the authority of the deputy commissioner-appellant who conducted the hearing and made an award determination against the respondent-appellee and in favor of the claimant under the Longshoremen's and Harbor Workers' Compensation Act); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 34 (1952) (deciding an intervenor's challenge to the authority of the Interstate Commerce Commission examiner who conducted the hearing and recommended issuance of a certificate).[13]

---

[13] Suggesting that direct harm need not be shown in an Appointments Clause challenge, *Landry*, 204 F.3d at 1131, quotes *Plaut v. Spenthrift Farm, Inc.*, 514 U.S. 211, 239 (1995): "[S]eparation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." Unlike the other cases cited in *Landry* in support of its harm-related comments, *Plaut* addressed neither standing nor a challenge to an official. *Plaut*, 514 U.S. at 213–16. But the quoted language is dictum as it was neither necessary to nor part of the *Plaut* majority's reasoning that resolved the case; it appears in response to a concurrence. *Compare id.* at 217–34, *with id.* at 240 (Breyer, J., concurring). As such, it cannot bear the weight of the assertion that Mr. Tooke need not show any specific harm caused by the Chief.

We similarly conclude that the reference in *Landry,* 204 F.3d at 1131, to *Synar*, 478 U.S. 714, cannot support the notion that harm need not be shown. In *Synar*, 478 U.S. at 721, the Supreme Court found that members of the National Treasury Employees Union had standing to challenge the constitutionality of the Comptroller

Relying on *Landry*, the U.S. Court of Appeals for the Third Circuit suggested in *Cirko ex rel. Cirko v. Commissioner of Social Security*, 948 F.3d 148, 154 (3d Cir. 2020), that "[a]n individual litigant need not show direct harm or prejudice caused by an Appointments Clause violation." But *Cirko*, 948 F.3d at 152, like *Landry*, did not explicitly rule on standing since the case arose in the context of plaintiffs challenging the appointment of the ALJs who heard their cases. Context matters when considering whether the sentiments expressed in *Landry* and *Cirko* should be applied to the Chief.

Of course, separation of powers issues are structural. *Freytag v. Commissioner*, 501 U.S. at 880 (describing the Appointments Clause as a "structural protection"); *Landry*, 204 F.3d at 1131. Yet *Landry's* suggestion that a plaintiff's harm can be "radically attenuated" to the challenged official and its intimation that plaintiffs need not show harm in separation of powers challenges—and practically every case cited in support—arose in the context of a plaintiff challenging the official or tribunal that heard his case. *Landry*, 204 F.3d at 1131; *see supra* pp. 20–21. The same is true in *Cirko*. Because Mr. Tooke's challenge to the appointment of the Chief arises in a fundamentally different context, we decline to extend *Landry's* and *Cirko's* assertions to the Chief.

As for the removal challenge, in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2195 (2020), the plaintiff challenged the statutory removal provision for the official who issued the civil investigative demand in the plaintiff's case, noting that the civil investigative demand was "originally issued" by the former Director.[14] The Supreme Court found a concrete injury existed because the plaintiff was compelled to comply with the demand and provide documents it would have preferred to withhold. *Id.* at 2196.

At oral argument Mr. Tooke relied on *Seila Law* for the notion that the Chief's lack of participation in the hearing did not foreclose Mr. Tooke's standing to challenge the Chief's appointment. But in *Seila Law*, 140 S. Ct. at 2196, the Supreme Court found a concrete injury existed in

General's role under the Balanced Budget and Emergency Deficit Control Act of 1985 because they would sustain injury by not receiving a scheduled increase in benefits.

[14] At oral argument, counsel for Mr. Tooke seemed to say that the official challenged in *Seila Law*, the Director of the Consumer Financial Protection Bureau (CFPB), did *not* issue the civil investigative demand. To the extent that is Mr. Tooke's reading of *Seila Law*, it is incorrect. The plaintiff challenged the removal provision for the Director of the CFPB. *Seila Law*, 140 S. Ct. at 2194. The Supreme Court explicitly stated that the demand was "originally issued by" the then Director. *Id.* at 2195.

part because the plaintiff was "compelled to comply with the civil investigative demand," which was "originally issued by" the challenged official, *id.* at 2195. Here, the Notice of Determination was signed not by the Chief but by ATM Warren. Given the Chief's lack of participation in the proceeding, including the issuance of the Notice of Determination, we cannot conclude that he inflicted an injury in fact upon Mr. Tooke.

Mr. Tooke also relies on *Free Enterprise Fund* in the same way that he relies on *Seila Law*. But it offers no help. In *Free Enterprise Fund*, 561 U.S. at 487, the Supreme Court considered the plaintiff's argument that members of the Public Company Accounting Oversight Board (PCAOB) were not adequately controlled by the president. Board members could be removed only for good cause shown and only by the Commissioners of the Securities and Exchange Commission, who themselves can be removed only for cause by the president. *Id.* at 486–87.

The Supreme Court held that "the dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." *Id.* at 492. In reaching this holding, the Supreme Court did not address standing. Yet participation warranted mention. In discussing the administrative proceeding, the Supreme Court noted that "[t]he Board inspected the firm, released a report critical of its auditing procedures, and began a formal investigation." *Id.* at 487. We take judicial notice of the report. *See, e.g.*, *Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1142 (11th Cir. 2020). We see nothing to indicate that it was issued under any authority other than that of the Board's members. *See* Public Company Accounting Oversight Board, Inspection Report of Beckstead & Watts, LLP, PCAOB No. 104-2005-082 (2005), https://web.archive.org/web/20051214123354/http://www.pcaobus.org/Inspections/Public_Reports/2005/Beckstead_and_Watts.pdf;[15] *see also* 15 U.S.C. § 7211(c), (e)(3). In contrast to the available information on the PCAOB members in *Free Enterprise Fund*, the record in this case is barren of any participation by the Chief. Given these distinctions, Mr. Tooke's reliance on these cases is unavailing.

B.     *Is the Injury "Fairly Traceable" to the Challenged Action?*

We also find that Mr. Tooke's injury is fairly traceable to the conduct he seeks to challenge of Appeals Officers and Appeals Team Managers, but not the Chief. *See Defenders of Wildlife*, 504 U.S. at 560.

---

[15] A copy of the report is available in the docket record of this case.

First, we will address traceability as it relates to Appeals Officers and Appeals Team Managers, and then we will discuss the same with respect to the Chief.

### 1.    *Appeals Officers and Appeals Team Managers*

We find that Mr. Tooke's injury is fairly traceable to the appointment (or lack thereof) of Appeals Officers and Appeals Team Managers. Mr. Tooke's CDP case was ultimately assigned to AO Herring, who conducted the CDP hearing and prepared the initial determination. Subsequently, ATM Warren reviewed and approved the Notice of Determination, which constitutes the basis of the instant case.

Like other Appointments Clause challengers, Mr. Tooke disputes the appointments of the individuals who participated in his CDP hearing. *See, e.g.*, *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021) (challenging the appointment of the putative officer who adjudicated the proceeding); *Lucia*, 138 S. Ct. 2044 (same); *Freytag v. Commissioner*, 501 U.S. at 871–72 (same). In such situations, the Supreme Court has either addressed only the merits or quickly resolved standing challenges in favor of plaintiffs. *See, e.g.*, *Seila Law*, 140 S. Ct. at 2196; *Freytag v. Commissioner*, 501 U.S. at 872. Taking our direction from Supreme Court precedent, we find that Mr. Tooke's injury is fairly traceable to the participation of Appeals Officers and Appeals Team Managers.

### 2.    *Chief of Appeals*

Conceding that the Chief did not participate in his hearing, Mr. Tooke argues that the standing requirement is nevertheless fulfilled because the statutory scheme places Appeals "under the supervision and direction" of the Chief. *See* § 7803(e)(2)(A). Given the Chief's lack of participation in Mr. Tooke's administrative proceeding, we find that Mr. Tooke's injury is not fairly traceable to the appointment (or lack thereof) of the Chief, despite the Chief's responsibility for the "supervision and direction" of Appeals and his being the official to whom all Appeals personnel report. *See* § 7803(e)(2)(A), (6)(A).[16]

---

[16] Because a plaintiff must demonstrate all three elements of standing, *see* *Defenders of Wildlife*, 504 U.S. at 560–61, our analysis as to the Chief could stop with our conclusion that Mr. Tooke has not met the injury in fact requirement. But given the statutory scheme, and for the sake of completeness, *see* *Mukhi*, 163 T.C., slip op. at 13, we will address the elements of causation and redressability.

This case arises in the context of CDP, and the authority to conduct a CDP hearing has been conferred generally on Appeals. Specifically, sections 6320(b)(1) and 6330(b)(1) provide that if a taxpayer "requests a hearing in writing under subsection (a)(3)(B) and states the grounds for the requested hearing, such hearing shall be held by the Internal Revenue Service Independent Office of Appeals." *See Organic Cannabis Found., LLC*, 161 T.C. at 19. Congress amended sections 6320(b)(1) and 6330(b)(1)—updating them in the Taxpayer First Act— to specify that the hearings would continue to be held by the now-codified Appeals. *See* Taxpayer First Act § 1001(b)(1)(B) and (C), 133 Stat. at 985. Congress also provided in the Taxpayer First Act that Appeals is "under the supervision and direction" of the Chief. *Id.* § 1001(a). Thus, Congress placed the hearings described in sections 6320(b)(1) and 6330(b)(1)—such as Mr. Tooke's—under the "supervision and direction" of the Chief. *See* §§ 6320(b)(1), 6330(b)(1), 7803(e)(2)(A).

Congress declared that "[a]ll personnel" in Appeals shall report to the Chief, § 7803(e)(6)(A), which means that the "officer[s] and employee[s]" of Appeals, a term synonymous with the term "appeals officers," report to the Chief, *see* §§ 6320(b)(3) ("The hearing under this subsection shall be conducted by an officer or employee . . . ."), 6330(b)(3) (same); *see also* §§ 6330(c)(1) ("The appeals officer shall at the hearing obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met."), 6330(c)(3) (providing that "[t]he determination by an appeals officer under" section 6330 shall take into consideration the verification requirement, issues raised by the taxpayer, and the balancing analysis), 6320(c) (applying section 6330(c) for the purposes of conducting hearings under section 6320); *Tucker I*, 135 T.C. at 154 ("[W]e conclude that section 6330 uses the term 'appeals officer' interchangeably with the term 'officer or employee.'").[17] Under the statutory scheme, the Chief's oversight of

---

[17] Nine years before enactment of the Taxpayer First Act, we observed in *Tucker I* that "[t]he authority to conduct CDP hearings and make determinations under sections 6320 and 6330 has been delegated to three positions within the Office of Appeals: (i) 'Appeals Officers', (ii) 'Settlement Officers', and (iii) 'Appeals Account Resolution Specialists'. . . . The authority to review and approve those determinations is delegated to team managers." *Tucker I*, 135 T.C. at 139 (citing Delegation Order 8a, IRM Exhibit 8.22.2-4 (Nov. 1, 2006)). The IRS subsequently revised the IRM. But we do not understand the changes made to the relevant IRM provision and the associated delegation order, *see* Delegation Order-Appeals-193-1, IRM Exhibit 8.22.4-1 (Aug. 26, 2020), to alter the point above.

Appeals is akin to that of a superintendent. We find that the Chief's superintendency of Appeals does not satisfy the causation requirement.

Our view aligns with decisions of other courts that have addressed similar separation of powers challenges. Two courts of appeals have rejected Appointments Clause challenges to an Assistant Attorney General at the Department of Justice (DOJ), in part by pointing out that the DOJ official "had no direct involvement in [the defendant's] case." *United States v. Castillo*, 772 F. App'x 11, 14 (3d Cir. 2019); *see also United States v. Smith*, 962 F.3d 755, 765–66 (4th Cir. 2020) ("At bottom, [the defendant] has cited no authority—nor could he—for his root-to-branch theory that as long as [the official's] tenure as Acting Attorney General was unlawful, then the integrity of his federal prosecution . . . was *necessarily* marred.").[18]

In a district court case challenging the appointment of the same DOJ official, the court held that the plaintiff lacked standing where, as here, the plaintiff showed "utterly no influence by or role of" the challenged official in his case. *United States v. Peters*, No. 17-CR-55-HAI-2, 2018 WL 6313534, at *7 (E.D. Ky. Dec. 3, 2018). Like the plaintiff in *Peters*, Mr. Tooke seeks to invalidate every ongoing CDP hearing as proceeding under faulty leadership. *See id.* But the nexus between Mr. Tooke and the Chief is, on this record, "purely a creature of statute." *Id.* at *6. Therefore, we are not persuaded that the scheme alone establishes causation. *See also Braidwood Mgmt. Inc.*, 627 F. Supp. 3d at 641 ("[S]tanding principles do not permit [p]laintiffs to challenge an unlawful appointment generally, or to challenge future exercises of unlawful authority. Plaintiffs' injuries must be traceable to government *action*."); *Braidwood Mgmt., Inc.*, 104 F.4th at 939 n.24, 957 (citing *Allen*, 468 U.S. at 751) ("Based on an independent review of the record and the plaintiffs' allegations, we are satisfied that [the plaintiffs] have alleged an injury in fact that is traceable to the defendants' conduct and redressable by a favorable judicial decision.").

Because the record establishes that the Chief was "at most an entirely indirect supervisor" of AO Herring and ATM Warren, *see Peters*, 2018 WL 6313534, at *6, we join the U.S. Courts of Appeals for the Third and Fourth Circuits in noting the absence of authority for a "root-to-branch theory" that the purported unlawful appointment of a remote

---

[18] The Court notes that neither *Castillo*, 772 F. App'x 11, nor *Smith*, 962 F.3d 755, explicitly ruled on standing. But given the strongly analogous fact patterns and relevant standing considerations, we find both cases helpful to the instant analysis.

official undermines the integrity of the proceeding, *Smith*, 962 F.3d at 765–66 (citing *Castillo*, 772 F. App'x at 14 n.6). Just as in *Smith*, Mr. Tooke relies on a root-to-branch theory that because the Chief's appointment was purportedly unconstitutional, the integrity of Mr. Tooke's CDP hearing and the determination made thereon were necessarily marred. We hold that Mr. Tooke must show that the Chief's tenure somehow affected his hearing and prejudiced him in some way. *See id.* at 766. Mr. Tooke has made no such showing. Accordingly, we find that Mr. Tooke's injury is not fairly traceable to the appointment of the Chief.

In the context of presidential removal power cases, plaintiffs have had standing when the challenged official or board participated in the plaintiff's case. *Seila Law*, 140 S. Ct. at 2195 (noting that the demand to the plaintiff was "originally issued" by the then Director); *Free Enterprise Fund*, 561 U.S. at 487 ("The Board inspected the firm, released a report critical of its auditing procedures, and began a formal investigation."). Unlike the challenged authorities in *Seila Law* and *Free Enterprise Fund*, the record before us does not establish that the Chief participated in Mr. Tooke's case.

Mr. Tooke relies heavily on *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021), in which the Supreme Court held that the shareholder-plaintiffs satisfied the causation requirement. But the Chief's lack of participation distinguishes this case from *Collins*. In that case, the plaintiffs challenged the removal restriction for the Director of the Federal Housing Finance Agency (FHFA). *Id.* at 1770. The agreement (the third amendment) between FHFA and the Treasury Department—which the plaintiffs alleged caused a diminution in the value of their shares—was signed by the then-Acting Director of FHFA. *Id.* at 1773 n.7.

In *Collins*, 141 S. Ct. at 1779, the Supreme Court found that the relevant action was the third amendment and that because the shareholders' concrete injury flowed directly from that amendment, the traceability requirement was satisfied. Assuming arguendo that AO Herring and ATM Warren are improperly appointed Officers of the United States, *see Tanner-Brown*, 105 F.4th at 445, Mr. Tooke's injury is the hearing; the adjudication tainted with an appointments violation, *see supra* p. 18; *see also Lucia*, 138 S. Ct. at 2055. The Supreme Court has repeated that a plaintiff must show "a causal connection between the injury and the conduct complained of." *Collins*, 141 S. Ct. at 1779 (quoting *Defenders of Wildlife*, 504 U.S. at 560). Because the record is void of any indication that the Chief participated in Mr. Tooke's CDP

hearing, we cannot conclude that the required connection exists. *See also Allen*, 468 U.S. at 757 (finding the line of causation between the IRS policy and plaintiffs' harm too attenuated).

"In the specific context of the President's removal power," the Supreme Court has found it sufficient that the challenger sustain an injury from "*an executive act* that allegedly exceeds the official's authority." *Seila Law*, 140 S. Ct. at 2196 (emphasis added) (citing *Synar*, 478 U.S. at 721). While we understand that the Chief supervises and directs Appeals, § 7803(e)(2)(A), and that all its personnel report to him, § 7803(e)(6)(A), we do not understand such superintendency to constitute "an executive act" or conduct specific to Mr. Tooke's case, *see Collins*, 141 S. Ct. at 1779 ("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant . . . ." (quoting *Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct." (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982))))); *see also id.* (citing *Seila Law*, 140 S. Ct. at 2196); Wright & Miller, *supra*, § 3531.4 ("The very notion of injury implies a causal connection to the challenged activity; an injury caused by other events is irrelevant to any purpose of standing doctrine."). As we have previously noted, *see supra* pp. 6, 17, nothing in the record indicates that the Chief participated in Mr. Tooke's case. As such, there is no "executive act" or "conduct" traceable to the Chief, or that exceeds the Chief's authority.

### C.     *Is the Injury Redressable?*

We now consider the third element of standing: redressability. For the redressability element to be satisfied, the Supreme Court has said that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Defenders of Wildlife*, 504 U.S. at 561; *see also Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024) ("To have standing, an individual plaintiff must have suffered an injury . . . that the court can redress with an order directed at the defendant."). As explained below, we conclude that Mr. Tooke's injury is redressable by an order of this Court directed to the Appeals Officer and Appeals Team Manager who participated in his hearing. We hold to the contrary with respect to the Chief.

Mr. Tooke argues that his injury is redressable by a favorable decision of the Court which, at the very least, could remand the case for

a new hearing upon cure of the purported constitutional infirmity. Respondent argues that Mr. Tooke is not entitled to any specific remedy.

The Tax Court is not an Article III Court, *see, e.g.*, *Freytag v. Commissioner*, 501 U.S. at 887–91, and therefore we do not have "jurisdiction to exercise the broad common law concept of judicial power invested in courts of general jurisdiction by Article III of the Constitution," *Estate of Rosenberg v. Commissioner*, 73 T.C. 1014, 1017 (1980). However, even in light of our jurisdictional constraints, the Court could provide some of the relief that Mr. Tooke seeks.

The Court has the authority to remand a CDP case for further consideration by Appeals when it would be "helpful," "necessary," or "productive." *Gurule v. Commissioner*, T.C. Memo. 2015-61, at *39 (first citing *Kelby v. Commissioner*, 130 T.C. 79, 86 n.4 (2008); then citing *Lunsford v. Commissioner*, 117 T.C. 183, 189 (2001); and then citing *Churchill v. Commissioner*, T.C. Memo. 2011-182). Upon remand, this Court retains jurisdiction of the proceeding to preserve the taxpayer's rights to judicial review of Appeals' supplemental determination. *Pomeroy v. Commissioner*, T.C. Memo. 2013-26, at *20 (citing *Wadleigh v. Commissioner*, 134 T.C. 280, 299 (2010)). Although the supplemental CDP hearing and corresponding supplemental determination are a continuation of the taxpayer's original CDP hearing, and not generally a new hearing, the Court reviews the conclusions in Appeals' latest determination. *See Kelby*, 130 T.C. at 86.

The Supreme Court has instructed that "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 183, 188). The Supreme Court has likewise directed that a new hearing cannot be conducted by the same official who conducted the constitutionally deficient hearing, even if that official has received a constitutional appointment. *Id.* This Court has the authority to decide constitutional issues that arise in cases before us, including questions related to the Appointments Clause. *See Battat*, 148 T.C. at 46–47 (collecting cases). Thus, we could remand this case for a new adjudication by properly appointed officials.

On the other hand, the Supreme Court and lower courts have consistently rejected theories of redressability that rest on speculation. For example, in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 30–32 (1976), the Supreme Court considered a challenge to an IRS revenue ruling, which held that nonprofit

hospitals could qualify for tax-exempt status while limiting admission to those who could pay. Indigent patients alleged that the IRS's policy encouraged tax-exempt hospitals to deny them services. *Id.* at 33. The Supreme Court drew the corollary allegation that a grant of the requested relief—resulting in a requirement that hospitals serve indigents as a condition for tax-exempt status—would discourage the hospitals from denying their services to indigents. *Id.* at 42. Concluding that it was "purely speculative" that a court-ordered IRS policy requiring tax-exempt hospitals to serve indigents would result in the indigent plaintiffs' receiving the care they sought, the Supreme Court held that they lacked standing. *Id.* at 42–46.

Further, drawing on the available sources of guidance, we note that the Fourth Circuit similarly declined to find a remedy in *Smith*, in which a criminal defendant challenged the appointment of an Acting Assistant Attorney General at DOJ. *Smith*, 962 F.3d at 765–66; *see supra* p. 26. The Fourth Circuit found that even if the defendant's constitutional argument was right, he still would not be entitled to the relief sought because he "failed to show in any discernible fashion how [the official's] designation affected the validity of [the defendant's] proceeding or prejudiced him in any way." *Smith*, 962 F.3d at 763. The Fourth Circuit continued, noting that it was "mystified as to exactly what the connection [was] between the appointment of which [the defendant] complain[ed] and his right to a fair trial," and held that the defendant was not entitled to the relief he sought. *Id.* at 765.[19]

### 1.  *Appeals Officers and Appeals Team Managers*

In a situation in which a plaintiff successfully challenges "an adjudication tainted with an [A]ppointments [Clause] violation," the "'appropriate' remedy" is a new hearing before a properly appointed official. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 183). With respect to AO Herring and ATM Warren, it is not speculative to conclude that a favorable decision by this Court would lead to a new hearing for Mr. Tooke before properly appointed officials. Even if AO Herring and ATM Warren receive constitutional appointments, neither could conduct the new hearing. *See id.* A new hearing before properly appointed, new officials would cleanse the taint of the Appointments

---

[19] As previously noted, each of the three elements of standing blends into the others. For example, "[c]ausation in turn bears on remedial benefit, since a remedy addressed to actions that have not caused the injury will not alleviate the injury." Wright & Miller, *supra*, § 3531.4.

Clause violation and prevent consideration by an official who "has already both heard [the] case and issued an initial decision on the merits." *Id.* In light of this guidance, we conclude that Mr. Tooke's injury is redressable by a favorable decision of this Court as to Appeals Officers and Appeals Team Managers.

## 2. *Chief of Appeals*

With respect to the Chief, however, redressability requires conjecture. Though a favorable decision of this Court could lead to a properly appointed Chief, the Chief's only relation to Mr. Tooke's hearing was that of a remote official. *See Smith*, 962 F.3d at 765–66. It is speculative to conclude that replacing the Chief with one who is properly appointed would cure the injury caused by the presumed constitutional defect in the hearing, which stems from the appointment, or lack thereof, of Appeals Officers and Team Managers. *See* Wright & Miller, *supra*, § 3531.4 ("[A] remedy addressed to actions that have not caused the injury will not alleviate the injury.").

In *Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 42–43, the Supreme Court considered the plaintiff's argument that the requested redress—a court-ordered IRS policy conditioning tax-exempt status on service to indigents—would discourage denials of hospital admissions. The Supreme Court found it "purely speculative" that denials of hospital service could be traced to the IRS's policy. *Id.*

So too here. The Chief is too distant from the case for any court order pointed to him to redress Mr. Tooke's harm. Because the Chief was a remote official in this case, *see Smith*, 962 F.3d at 765–66, and because Mr. Tooke has not shown that the Chief's tenure prejudiced him in any way, mere speculation supports the notion that a properly appointed and removable Chief would cleanse from Mr. Tooke's hearing the taint of the injury, which was caused by presumed Appointments Clause violations at the hands of an Appeals Officer and an Appeals Team Manager.

Accordingly, Mr. Tooke has standing to raise the Appointments Clause challenge as to AO Herring and ATM Warren. He lacks standing to challenge the appointment or removal of the Chief.[20] What's the Chief

---

[20] For the sake of completeness, we have fully addressed Mr. Tooke's standing to challenge the Chief. *See supra* notes 11, 16. However, we need not reach the merits of his argument that Appeals is a "de facto independent agency." It is part-and-parcel of his removability challenge, which he lacks standing to raise.

got to do with it? Nothing, on this record. That being the case, we will address the Chief no further.

We now turn to the merits of Mr. Tooke's challenges to Appeals Officers and Appeals Team Managers.

IV.     *Classification Under the Appointments Clause, Generally*

Having resolved the issue of standing, we will now turn to the merits of Mr. Tooke's Appointments Clause arguments. First, we will discuss the method of classifying Officers of the United States, including the distinction between "Officers" and "non-officer employees" and "principal Officers" and "inferior Officers." Next, we will survey the arguments presented by the parties. Finally, we will analyze the status of Appeals Officers and Appeals Team Managers under the Appointments Clause.

A.     *Method of Classifying Officers of the United States*

1.     *"Officers" vs. Nonofficer Employees*

The Appointments Clause applies to all "Officers," *see Lucia*, 138 S. Ct. at 2051, and therefore there is little doubt that all persons who can be said to occupy an office were intended to be appointed within one of the modes of appointment provided therein, *see United States v. Germaine*, 99 U.S. 508, 510 (1878). Implicit within the Appointments Clause is the distinction between "Officers of the United States," who must be appointed in accordance with the mandates of the Appointments Clause, and nonofficer employees or "lesser functionaries," whom the "Appointments Clause cares not a whit about who named them." *Lucia*, 138 S. Ct. at 2051; *see also Freytag v. Commissioner*, 501 U.S. at 880–81 (stating that nonofficer employees are lesser functionaries who "need not be selected in compliance with the strict requirements of Article II"); *Buckley*, 424 U.S. at 126 n.162. If an individual is an "Officer of the United States" with respect to some duties but not to others, they are still nonetheless an "Officer of the United States." *Freytag v. Commissioner*, 501 U.S. at 882.

However, two Supreme Court cases set out the basic framework for distinguishing between officers and nonofficer employees, and that will guide our analysis. *See Lucia*, 138 S. Ct. at 2051. We will discuss each case in turn.

### a. *United States v. Germaine*

First, in *Germaine*, 99 U.S. at 506, the Supreme Court examined the nature of employment of a "civil surgeon." Reflecting on the understanding of the nature and purpose of appointments at the time of ratification, the Supreme Court stated "[t]hat all persons who can be said to hold an office under the government about to be established under the Constitution were intended to be included within one or the other of these modes of appointment there can be but little doubt." *Id.* at 510. The Court continued, stating that "the term [Officer of the United States] embraces the ideas of tenure, duration, emolument, and duties, and that the latter were continuing and permanent, not occasional or temporary." *Id.* at 511–12. Because the surgeon's duties were "occasional and intermittent," he was not an "Officer of the United States." *Id.* at 512.

### b. *Buckley v. Valeo*

Second, in *Buckley*, 424 U.S. at 118, the Supreme Court examined the powers of the Federal Election Commission (FEC). Therein, the Supreme Court held that a position invested with "significant authority"[21] is an "Office," stating:

> We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in *United States v. Germaine* . . . is a term intended to have substantive meaning. We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by [the Appointments Clause].

*Id.* at 125–26. The Supreme Court continued, stating that "the term 'Officers of the United States,' . . . since it had first appeared in Art. X [of the Constitution during the constitutional convention] had been taken by all concerned to embrace all appointed officials exercising responsibility under the public laws of the Nation." *Id.* at 131.

---

[21] The Supreme Court has acknowledged that *Buckley's* significant authority test remains amorphous and that "[t]he standard is no doubt framed in general terms." *See Lucia*, 138 S. Ct. at 2051.

In *Buckley*, the Supreme Court concluded that the FEC's Commissioners were not appointed in accordance with the Appointments Clause, and thus none of them were permitted to exercise "significant authority." *See generally id.* at 126, 137. The Court classified the FEC's powers into groups to determine whether they were "significant," stating:

> [T]he Commission's powers fall generally into three categories: functions relating to the flow of necessary information—receipt, dissemination, and investigation; functions with respect to the Commission's task of fleshing out the statute—rulemaking and advisory opinions; and functions necessary to ensure compliance with the statute and rules—informal procedures, administrative determinations and hearings, and civil suits.

*Id.* The Supreme Court held that it was not permissible for the unappointed commissioners to exercise their "more substantial [enforcement and interpretive] powers." *Id.* at 138. Specifically, only "Officers of the United States" could exercise the "significant" power to bring suit to enforce an act of Congress or to issue regulations, advisory opinions, and determinations without supervision under an Act of Congress. *Id.* at 138–41; *see also Tucker I*, 135 T.C. at 161–62.

In summary, an individual can be said to be an "Officer of the United States" if (1) her "duties . . . [are] continuing and permanent, not occasional or temporary," *Germaine*, 99 U.S. at 511–12, and if those duties are "established by Law," U.S. Const. art. II, § 2, cl. 2; and (2) she "exercis[es] significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126.

c. *Modern Application and Developments*

The Supreme Court applied this two-part framework in *Freytag v. Commissioner*, 501 U.S. at 881–82, and *Lucia*, 138 S. Ct. at 2051. In *Freytag v. Commissioner*, 501 U.S. at 881–82, the Supreme Court applied the framework to analyze whether Tax Court STJs were "Officers of the United States." First, the Court explained that "[t]he office of special trial judge is 'established by Law,' Art. II, § 2, cl. 2, and the duties, salary, and means of appointment for that office are specified by statute." *Id.* at 881. The Court found STJs were distinguishable from special masters that were hired by Article III courts on a "temporary,

episodic basis, whose positions [were] not established by law, and whose duties and functions [were] not delineated in a statute." *Id.*

Then the Court applied the "significant authority" standard and observed that STJs lacked the authority to render a final decision in major cases. *Id.*; *see also Lucia*, 138 S. Ct. at 2052 n.4. However, discounting the inability of STJs to enter a final decision, the Supreme Court instead focused on the "significance of the duties and discretion that special trial judges [did] possess." *Freytag v. Commissioner*, 501 U.S. at 881. The Court stated that STJs "perform more than ministerial tasks. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. In the course of carrying out these important functions, the special trial judges exercise significant discretion." *Id.* at 881–82. Because of their significant discretion, STJs "were officers, even when their decisions were not final." *See Lucia*, 138 S. Ct. at 2052.

In *Freytag v. Commissioner*, 501 U.S. at 882, the Supreme Court also set forth an alternative basis for finding that the STJs were officers, stating that "[e]ven if the duties of special trial judges [in major cases] . . . were not as significant as we . . . have found them to be, our conclusion would be unchanged." This is because the Commissioner conceded that in the minor cases where STJs could enter final decisions, they exercised enough "independent authority" to be considered "inferior officers." *Id.*; *see also Lucia*, 138 S. Ct. at 2052 n.4.

More recently, in *Lucia,* 138 S. Ct. at 2049, the Supreme Court examined whether ALJs for the SEC were "Officers of the United States." The Supreme Court observed that SEC ALJs were "near-carbon copies" of Tax Court STJs, and therefore the Court's "analysis [in *Freytag*] (sans any more detailed legal criteria) necessarily decides this case." *Id.* at 2052. The Court stated that the SEC ALJs "exercise the same 'significant discretion' when carrying out the same 'important functions' as STJs do." *Id.* at 2053 (quoting *Freytag v. Commissioner*, 501 U.S. at 882).

The Court observed that both STJs and ALJs "have all the authority needed to ensure fair and orderly adversarial hearings— indeed, nearly all the tools of federal trial judges." *Id.* First, both STJs and ALJs could take testimony, receive evidence, examine witnesses at hearings, and take pre-hearing depositions. *Id.* Second, the Supreme Court found that SEC ALJs, like Tax Court STJs, conduct trials, administer oaths, rule on motions, and generally regulate the course of

a hearing, including the conduct of the parties and counsel. *Id.* Third, the Supreme Court found that SEC ALJs, like Tax Court STJs, critically shape the administrative record by ruling on the admissibility of evidence or issuing document subpoenas. *Id.* And, fourth, the Supreme Court found that SEC ALJs and Tax Court STJs enforce compliance with discovery orders and punish contemptuous conduct. *Id.*

Furthermore, SEC ALJs—like STJs—issued factual findings, legal conclusions, and appropriate remedies. *Id.* Nonetheless, the positions were slightly distinguishable because the decisions of STJs in major cases were always subject to review, whereas SEC ALJs played a more autonomous role because their decisions would be deemed the action of the SEC when the Commission declined to review them. *Id.* at 2053–54. Therefore, the Supreme Court concluded "[t]hat last-word capacity makes this an *a fortiori* case: If the Tax Court's STJs are officers, as *Freytag* held, then the Commission's ALJs must be too." *Id.* at 2054. In doing so, the Supreme Court clarified that one can be an officer even when her decisions are not final, thereby rejecting the theory that final decision-making authority is a sine qua non of officer status. *Id.* at 2052 n.4.

### 2. *"Principal" Officers vs. "Inferior" Officers*

If an individual is properly classified as an "officer," then the next step is to determine which class of office they possess. The Appointments Clause recognizes two classes of "Officers of the United States": "principal officers" and "inferior officers." The Framers provided scant guidance on where the line between principal officer and inferior officer should be drawn. *Tucker I*, 135 T.C. at 122 (citing *Morrison v. Olson*, 487 U.S. 654, 671 (1988)). However, caselaw has helped develop this distinction. *See Arthrex*, 141 S. Ct. at 1980 (citing *Edmond*, 520 U.S. at 662).

The primary class of officer is "principal officer." *See Germaine*, 99 U.S. at 509–10, 511. The term "principal officer" does not appear in the Appointments Clause, but rather it comes from the clause immediately preceding the Appointments Clause, *see* U.S. Const. art. II, § 2, cl. 1,[22] and refers to those officers who must be nominated by the

---

[22] Article II, Section 2, Clause 1 of the Constitution states that "[t]he President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."

President and confirmed with the advice and consent of the Senate, *see Tucker I*, 135 T.C. at 122.

The other class of officer is "inferior officer." *See, e.g., Freytag v. Commissioner*, 501 U.S. at 882. "Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond*, 520 U.S. at 662. "An inferior officer must be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Arthrex*, 141 S. Ct. at 1980 (quoting *Edmond*, 520 U.S. at 663). In the absence of a provision by Congress, the default method of appointment for inferior officers is nomination by the President and confirmation with the advice and consent of the Senate. *See Edmond*, 520 U.S. at 660. However, "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

B.    *Overview of Arguments*

Mr. Tooke's Appointments Clause motion is premised on the belief that statutory amendments under the Taxpayer First Act, when combined with interceding judicial holdings since this Court's decision in *Tucker I*, mandate the conclusion that the positions of Appeals Officers and Appeals Team Managers are "Officers of the United States" who must be appointed in accordance with the Appointments Clause. *See* U.S. Const. art. II, § 2, cl. 2. Mr. Tooke highlights recent cases from the Supreme Court and several Courts of Appeals, which he argues make this Court's decision in *Tucker I* "non-controlling." *See Arthrex*, 141 S. Ct. 1970; *Lucia*, 138 S. Ct. 2044; *Burgess*, 871 F.3d 297; *Helman v. Dep't of Veteran Affs.*, 856 F.3d 920 (Fed. Cir. 2017); *Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016).

Mr. Tooke asserts two principal arguments: (1) Appeals Officers are "inferior officers" because they occupy a continuing position, exercise directives established by law, wield significant decision-making authority, and have the power to bind the government in significant matters; and (2) Appeals Team Managers are "principal officers" because they review and approve or overrule determinations on behalf of Appeals. Accordingly, Mr. Tooke believes that each individual must be appointed in accordance with the mandates of the Appointments

Clause, and he asks the Court to remand his case to Appeals for a constitutionally sufficient proceeding.

Respondent disagrees and argues that this Court's decision in *Tucker I*, which was subsequently affirmed by the D.C. Circuit, *see Tucker II*, 676 F.3d 1129, should dictate the outcome of the case. Respondent primarily contends that (1) Appeals Officers and Appeals Team Managers do not occupy positions that are established by law, *see Tucker I*, 135 T.C. at 155 ("The statute [section 6330] thus does not create any positions for the personnel who would perform the CDP function but rather refers to them in a most diffuse manner ('conducted by an officer or employee')."), and (2) Appeals Officers and Appeals Team Managers do not wield significant authority because they lack significant discretion in their decision-making and, although not conclusive, they lack the authority to make final decisions.

C.     *Classification Under the Appointments Clause*

The constitutional questions presented in Mr. Tooke's Appointments Clause motion warrant our careful consideration. We are asked to revisit our opinion in *Tucker I* and consider whether the amendments enacted by the Taxpayer First Act, as well as any intervening judicial decisions, warrant diverging from our finding in *Tucker I* that Appeals Officers and Appeals Team Managers are not Officers of the United States. *Tucker I*, 135 T.C. 114; *see also Tucker II*, 676 F.3d 1129; *Fonticiella*, T.C. Memo. 2019-74.

As to Appeals Officers and Appeals Team Managers, we conclude—as did the D.C. Circuit in *Tucker II*—that such officers do not wield significant authority. *Tucker II*, 676 F.3d at 1135. In *Lucia*, the Supreme Court found that "point for point," ALJs had duties and powers equivalent to those held by the STJs in *Freytag*, including, inter alia, the power to take testimony, receive evidence, examine witnesses at hearings, take pre-hearing depositions, conduct trials (e.g., administer oaths, rule on motions), rule on the admissibility of evidence, and enforce compliance with discovery orders. *Lucia*, 138 S. Ct. at 2053; *see also Freytag v. Commissioner*, 501 U.S. at 881–82.

Appeals Officers do not have authority to examine witnesses; Tax Court STJs and SEC ALJs do. *See Lucia*, 138 S. Ct. at 2053. "Testimony under oath is not taken" during an Appeals conference. Statement of Procedural Rules, 26 C.F.R. § 601.106(c). And in fact, no position in Appeals has been delegated the authority to take testimony under oath.

IRM 1.2.2.15.1 (July 19, 2016); *cf.* Treas. Reg. § 301.7602-1(b)(2). This is in clear contrast to the authority of Tax Court STJs, *see* § 7456(a) (1991), and SEC ALJs, *see* 17 C.F.R. § 201.111(a), both of whom have the power to administer oaths and receive testimony under oath.

Further, Appeals Officers lack the power to, and neither "[t]he taxpayer [n]or the taxpayer's representative . . . [has] the right to[,] subpoena and examine witnesses at a CDP hearing." Treas. Reg. §§ 301.6320-1(d)(2), Q&A-D6, 301.6330-1(d)(2), Q&A-D6; *see also Roberts v. Commissioner*, 118 T.C. 365, 372 (2002) (first citing *Nestor v. Commissioner*, 118 T.C. 162 (2002); and then citing *Davis v. Commissioner*, 115 T.C. 35, 41–42 (2000)), *aff'd per curiam*, 329 F.3d 1224 (11th Cir. 2003). Appeals Officers also lack the power to issue, serve, and enforce summonses through the IRS's general power to examine books and witnesses. *See* IRM 1.2.2.15.1; *cf.* Treas. Reg. § 301.7602-1(b)(2). Thus, an Appeals Officer is distinguishable from Tax Court STJs, *see* § 7456(a) (1991), and SEC ALJs, *see* 17 C.F.R. § 201.111(b), both of whom have the power to issue subpoenas. Appeals Officers lack these powers because discovery does not occur during these informal hearings before Appeals. *See, e.g.*, *Lindberg v. Commissioner*, T.C. Memo. 2010-67, 2010 WL 1330343, at *11.

The greatest extent to which an Appeals Officer can exercise anything remotely resembling powers over matters of discovery is to request (but not compel) that matters alleged as fact be "submitted in the form of affidavits, or declared to be true under the penalties of perjury." Statement of Procedural Rules, 26 C.F.R. § 601.106(c).

In sum, Appeals Officers cannot be said to have the same degree of powers as Tax Court STJs or SEC ALJs, and they certainly cannot be said to have "nearly all the tools of federal trial judges." *Lucia*, 138 S. Ct. at 2053. Appeals Officers wield significantly fewer procedural tools, and they cannot be said to have the same broad powers as STJs or ALJs to regulate the course of the proceedings that occur before them. *See id.*; *Freytag v. Commissioner*, 501 U.S. at 881–82. While we recognize their authority to compromise disputed tax liabilities, *Tucker II*, 676 F.3d at 1134, the D.C. Circuit found such authority "insufficient to rank [Appeals employees] as inferior Officers," *id.* at 1135. Notwithstanding the Supreme Court's observation that final decision-making authority is not a sine qua non of an inferior officer, *Lucia*, 138 S. Ct. at 2052 n.4, the Supreme Court subsequently found in *Arthrex*, 141 S. Ct. at 1981, that it was "significant" that administrative patent judges had the power to render a final decision on behalf of the United States without

review by their nominal superiors or any other principal officer in the Executive Branch. For all the reasons discussed above, which are underscored by the fact that an Appeals Officer's decision is subject to review by, among others, an Appeals Team Manager, we conclude that Appeals Officers do not possess significant authority. Therefore, they are not Officers of the United States.

With respect to Appeals Team Managers, we see no reason to depart from the conclusion we reached in *Tucker I*, that they do not wield significant authority. For starters, the D.C. Circuit affirmed that judgment in *Tucker II*, 676 F.3d 1129, so we have no cause to revisit our holding. *See Valley Park Ranch, LLC v. Commissioner*, No. 12384-20, 162 T.C., slip op. at 9–10 (Mar. 28, 2024) (reviewing circumstances in which this Court has revisited its position following reversal by an appellate court).

In *Tucker I*, we reasoned that Appeals Team Managers lack the formal powers of ALJs under the Administrative Procedure Act (APA). *Tucker I*, 135 T.C. at 165 (citing Treas. Reg. § 301.6330-1(d)(2), Q&A-D6). That remains true. In the Taxpayer First Act, Congress could have bestowed APA-ALJ powers upon employees of Appeals, including Appeals Team Managers. But Congress did not do so. Additionally, although Appeals Team Managers review and approve most CDP determinations, those determinations are subject to review by, among others, the Commissioner. *See* § 7804(a); *cf. Arthrex*, 141 S. Ct. at 1981. Consequently, nothing in the record indicates that ATM Warren exercised any of the adjudicatory powers of an inferior officer, much less a principal officer. *See Lucia*, 138 S. Ct. at 2053; *Freytag v. Commissioner*, 501 U.S. at 881–82. It follows that Appeals Team Managers are not principal or inferior officers. Oversight of Appeals Officers, who are not themselves inferior officers, does not transform Appeals Team Managers into principal officers.

We appreciate Mr. Tooke's arguments that certain provisions in sections 6320 and 6330 designate the duties of the "officer[s] or employee[s]" of Appeals. *See* §§ 6320(b)(1), (3), 6330(b)(1), (3), (c)(1), (3); *Tucker I*, 135 T.C. at 152–56. But because the bottom line remains the same—Appeals Officers and Appeals Team Managers are not "Officers of the United States"—we need not revisit our holding in *Tucker I* that these positions are not "established by Law."

V.    *Conclusion*

For the reasons discussed, we find that Mr. Tooke lacks standing to challenge the appointment of the Chief under the Appointments Clause and the removal of the Chief under the separation of powers doctrine. As to Appeals Officers and Appeals Team Managers, we follow *Tucker I* in its conclusion that such personnel are not Officers of the United States.

The Court has considered all the other contentions of the parties and, to the extent not discussed above, finds those arguments to be irrelevant, moot, or without merit.

*An appropriate order will be issued.*